**Holly McMUNN, Plaintiff,**

v.

**MEMORIAL SLOAN–KETTERING CANCER CENTER, Defendant.**

**No. 97 Civ. 5857(NRB).**

United States District Court, S.D. New York.

March 27, 2002.

Ms. Holly McMunn, Park West Station, New York City, Plaintiff, pro se.

Edward A. Brill, Proskauer Rose LLP, New York City, for Defendant.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiff Holly McMunn brings this action against defendant Memorial Sloan–Kettering Cancer Center ("Memorial") alleging disability discrimination in violation of, *inter alia,* the Americans with Disabilities Act ("ADA"). We have previously denied a motion by Memorial for summary judgment. *See McMunn v. Memorial Sloan–Kettering Cancer Ctr.,* 2000 WL 1341398, at *4 (S.D.N.Y. Sept.15, 2000) (whether Ms. McMunn is perceived to be disabled within meaning of ADA must be determined by a jury). Memorial now moves to dismiss the Complaint and for an award of monetary sanctions for alleged misconduct by Ms. McMunn. For the reasons that follow, we dismiss this action with prejudice and award a $20,000 monetary sanction against Ms. McMunn.

## BACKGROUND [1]

Ms. McMunn brought this employment discrimination suit in August of 1997 alleging that she was terminated by her superior, Dr. Thomas Fahey, Senior Vice President for Clinical Program Development, and a breast cancer specialist. She claims that, during the six months that she worked for Dr. Fahey, she was an "exemplary" employee and that Dr. Fahey had "frequently praised [her] work performance," but that, when Dr. Fahey read her medical chart on September 9, 1994, thereby learning that she had breast cancer, he abruptly fired her. Compl. ¶¶ 15–16. Ms. McMunn alleges that Dr. Fahey

---

1. A more extensive discussion of the factual background of the merits of this case is available in our previous opinion. *See McMunn,* 2000 WL 1341398, at *1.

fired her "because she had breast cancer, had a record of breast cancer, and because of [his] presumptions and fears about her disability and perceived disability." *Id.* ¶ 28. Memorial defends her termination on the ground that she was fired for a legitimate, non-discriminatory reason, namely, that she had been absent from work an unreasonable number of days in the few months during which she worked for Dr. Fahey.

## DISCUSSION

Memorial moves for dismissal of Ms. McMunn's lawsuit and monetary sanctions pursuant to Federal Rule of Civil Procedure 37 and the inherent power of this Court to "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Rule 37, however, only applies to instances where a party (or certain other actors) "fails to obey an order to provide or permit discovery." Fed.R.Civ.P. 37(b)(2). While some of Ms. McMunn's misconduct would clearly qualify for sanctions under this Rule, much of it would not, as her behavior goes well beyond distinct violations of our discovery orders.[2] Accordingly, we consider Memorial's motion in the context of our broader inherent power, because such power "extends to a

full range of litigation abuses," including fraud upon the court. *Chambers*, 501 U.S. at 46, 111 S.Ct. 2123; *see also Skywark v. Isaacson*, 1999 WL 1489038, at *14 n. 27 (S.D.N.Y. Oct.14, 1999), *aff'd* 2000 WL 145465 (S.D.N.Y. Feb.9, 2000).

We proceed herein as follows: We will discuss the concept of "fraud upon the court," then our conclusion that the behavior at issue here rises to that level. Next, after setting forth the various sanctions available, we will explain our determination that both dismissal and a monetary sanction are appropriate in this case. Initially, however, we set out the due process safeguards we afforded Ms. McMunn.[3]

## I. Due Process

■ Dismissal with prejudice is "a particularly severe sanction," *Chambers*, 501 U.S. at 45, 111 S.Ct. 2123, even for a fraud upon the court, and a decision to impose such a sanction must be "made with restraint and discretion." *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir.1999). Accordingly, once Memorial requested permission to make the instant motion, *see* Letter from Edward A. Brill dated July 10, 2001 ("7/10/01 Ltr."),[4] we made every effort to ensure that Ms. McMunn would receive the process she was due. *See Chambers*, 501 U.S.

---

**2.** Dismissal under Rule 37 would be inappropriate here because, while there is a clear pattern of misconduct, it does not take the form of repeated and flagrant defiance of clear discovery orders issued by a district court that characterizes many Rule 37 dismissal cases. *See, e.g., Baba v. Japan Travel Bureau Int'l Inc.*, 111 F.3d 2, 5 (2d Cir.1997) (plaintiff's "stubborn failure to comply with the court's discovery orders justified the district court's decision to dismiss [her] claims" under Rule 37.); *Davis v. Kauff, McClain & McGuire*, 1998 WL 50220, at *1 (S.D.N.Y. Feb.5, 1998) (dismissing case because, "[n]otwithstanding my oral order, written order, and warning as to the consequences of noncompliance, plaintiff refused to comply");

*Monaghan v. SZS 33 Assocs.*, 148 F.R.D. 500, 509 (S.D.N.Y.1993) (dismissal under Rule 37 occurs "[m]ost often" due to "a party's persistent refusal to comply with a discovery order").

**3.** As in *Skywark*, we "analogiz[e] to cases considering dismissal under Rule 37 to distill appropriate standards for dismissal pursuant to a fraud upon the court theory." 1999 WL 1489038, at *14 n. 27. There, as here, the plaintiff's bad acts occurred in the context of court-supervised discovery. *Id.*

**4.** All letters and faxes are abbreviated herein in this manner.

at 50, 111 S.Ct. 2123 (in exercising its inherent powers, a court must "comply with the mandates of due process"). Due process, in the context of sanctioning an attorney or a party, required that Ms. McMunn be granted notice and an opportunity to be heard. *Schlaifer Nance*, 194 F.3d at 335.

At a conference held on July 12, 2001, counsel for Memorial sought "leave to move to dismiss this case based on the improper conduct of the plaintiff." Transcript of Conference held July 12, 2001, at 2. This request was granted. *Id.* at 14. Memorial served its motion to dismiss and for monetary sanctions on August 3 and, on August 7, Gary Ireland, then counsel for Ms. McMunn,[5] requested the opportunity to hire an expert to assist in responding to Memorial's motion, as well as an extension of time in which to submit opposition papers. *See* 8/7/01 Ltr. A phone conference was subsequently held on August 9 during which Mr. Ireland was granted permission to hire an expert as well as an extension to submit an opposition brief until September 21, 2001. In a letter dated August 14, 2001, Mr. Ireland stated the following:

> After discussions with Plaintiff, it is mutually agreed that we can longer proceed in this action working together. Both Plaintiff and I respectfully request an order relieving me as counsel. In addition, Plaintiff requests an order suspending all discovery and motion practice for a reasonable amount of time to afford her the opportunity to retain counsel.

8/14/01 Ltr. Memorial consented to this request on the condition that Ms. McMunn timely meet certain outstanding discovery obligations. 8/15/01 Ltr.

At a conference held on August 22, we granted Mr. Ireland and Ms. McMunn's joint request. Approximately one month later, Ms. McMunn wrote to the Court, "I am writing to propose that a fair settlement of this case could include reasonable remuneration with *both* parties dropping all actual and alleged charges. If this is not acceptable, I would have no choice but to represent myself pro se." 9/17/01 Ltr. (emphasis in original).[6] We commenced yet another conference on October 4, 2001, in order to discuss settlement.

At this conference, Ms. McMunn acknowledged that she was not sure what settlement terms she was willing to offer Memorial. Thus, we ordered her to send Memorial and the Court a letter with a concrete settlement proposal within a week or so. In a letter dated October 10, 2002,[7] Ms. McMunn made a settlement offer, but Memorial declined to settle on Ms. McMunn's proposed terms.[8]

Ms. McMunn served her opposition memorandum, containing forty-six pages and forty-four exhibits, on October 31, 2001. Following the submission of Memorial's reply memorandum on November 26,

---

**5.** At the time she served her Complaint, in 1997, Ms. McMunn was represented by John A. Beranbaum, Esq. On May 21, 1998, Mr. Beranbaum, Ms. McMunn, and counsel for Memorial stipulated that no objection was posed to Mr. Beranhaum's application to withdraw as counsel for Ms. McMunn. In an Order dated June 9, 1998, Judge Sprizzo, who later recused himself, granted the application to withdraw. Ms. McMunn thus proceeded *pro se* from that date until February 6, 2001, when Mr. Ireland appeared on her behalf.

**6.** As Ms. McMunn did not send a copy of this letter to Memorial, the Court did so on her behalf.

**7.** *See* note 6, *supra*.

**8.** In this letter, Ms. McMunn also requested that the Court appoint an attorney to assist her. This request was denied. Ms. McMunn has thus proceeded *pro se* since Mr. Ireland was permitted to withdraw on August 22, 2001.

Ms. McMunn telephoned the Court on November 27, requesting the opportunity to file a sur-reply. Ms. McMunn was granted permission to file a sur-reply of no more than ten pages of argument, to be served by December 17. On December 13, Ms. McMunn telephoned the Court to request an additional two days in which to serve her sur-reply, which request was granted. On December 19, Ms. McMunn served her sur-reply, consisting of sixteen pages of argument and sixty exhibits.[9]

In a letter dated January 4, 2002, Ms. McMunn wrote to the Court:

> I am writing to request a hearing or a conference so that I can show you that Memorial Sloan–Kettering submitted a falsified document to you in its Reply. I would like to present this to you and show that Memorial's Motion to Dismiss my case should be dismissed on this basis. I would like to request that you place sanctions on Memorial. I would like to request that Memorial be punished to the fullest extent in this matter.

Then, in a letter dated January 5, 2002, Ms. McMunn requested an oral argument on Memorial's motion to dismiss, and in a letter dated January 7, 2002, she requested permission to "submit a Cross Motion to Dismiss Memorial's Motion to Dismiss my case." We sent a letter to the parties on January 9, denying Ms. McMunn's request for leave to file a cross-motion on the ground that she had already submitted a significant amount of briefing on the issues she indicated would be the subject of her motion. However, in a letter dated January 11, 2002, the Court granted Ms. McMunn's request for oral argument, which was scheduled for February 4, 2002.[10]

Ms. McMunn apparently believed that the deposition transcript of Trisha Hodges, an employee of Memorial, would support her contention that Memorial had provided the Court with a forged document. As Ms. McMunn represented to the Court that she did not have a copy of Ms. Hodges's deposition transcript in her possession, at a phone conference on January 29, we facilitated her review thereof at the offices of Memorial's counsel.[11] Finally, the Court held a two-hour oral argument on the present motion on February 4, 2002.

In light of the foregoing, we believe that Ms. McMunn was granted adequate notice of the possibility that the Court would dismiss her suit for misconduct without reaching the merits, and that she was given every opportunity to be heard in oppo-

---

**9.** While her submission was significantly longer than was permitted, in light of the fact that she was *pro se*, the Court accepted her sur-reply as part of the record.

**10.** In that same letter, the Court also granted Memorial's request, contained in a letter dated January 9, 2002, to submit a five-page affidavit on the authenticity of the document that Ms. McMunn claimed, in her January 4, 2002 letter, to be a forgery. *Id.* Ms. McMunn was granted permission to submit a five-page response to this affidavit by January 30.

**11.** In a letter to the Court dated January 28, 2002, Ms. McMunn wrote that Proskauer Rose, counsel for Memorial, "has refused to let [her] come to its office to review" the Hodges transcript. McMunn 1/28/02 Ltr. Memorial, however, pointed out to the Court that Ms. McMunn had attached pages from the Hodges transcript to her sur-reply, and, therefore, had no need to examine Memorial's copy. *See* Pl.'s Sur–Reply Ex. P. Brill 1/28/02 Ltr. A phone conference was held on January 29, where Ms. McMunn represented that she had lost her copy of the transcript she sought. Accordingly, Memorial invited Ms. McMunn to review the transcript that very day. Ms. McMunn asked if she would be permitted to review the transcript the next day, January 30. This request was granted. Eventually, Ms. McMunn was able to review the transcript at the offices of Proskauer Rose, and the Court received her response to Memorial's affidavit on January 31.

sition thereto. In all, Ms. McMunn submitted no fewer than 70 pages of briefing and 125 exhibits in opposition to Memorial's motion. Further, she had opportunities to be heard at oral argument, as well as during conferences held in court and by telephone since Memorial served its motion.[12]

Finally, also in an effort to protect Ms. McMunn's procedural rights, we have applied a "clear and convincing" standard to any findings of fact we have made. *See Shepherd v. American Broadcasting Cos., Inc.*, 62 F.3d 1469, 1477 (D.C.Cir.1995) (to dismiss a suit for abusive behavior under inherent power, district court must find by "clear and convincing evidence" that abusive behavior occurred); *cf. Weinberger v. Kendrick*, 698 F.2d 61, 80 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983) (requiring "clear evidence" to support attorneys' fees awarded on the basis of bad faith); *Rybner v. Cannon Design, Inc.*, 1996 WL 470668, at *4 (S.D.N.Y. Aug.20, 1996) (sanctioning plaintiff where "defendants have proven by *clear and convincing evidence* that [he] acted intentionally, wilfully and in bad faith") (emphasis supplied).

## II. Fraud Upon the Court

 Fraud upon the court is "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988). It is well-settled, however, that an isolated instance of perjury, standing alone, will not constitute a fraud upon the court. *Id.* at 560; *Doe v. Federal Grievance Comm. (In re Grievance Comm. of the United States Dist. Ct., Dist. of Conn.)*, 847 F.2d 57, 64 (2d Cir.1988) (Graafeiland, J., concurring). Rather, fraud upon the court "occurs where a party has acted knowingly in an attempt to hinder the fact finder's fair adjudication of the case and his adversary's defense of the action." *Skywark*, 1999 WL 1489038, at *14. In other words, a fraud upon the court

> occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

*Aoude*, 892 F.2d at 1118.

Our judicial system generally relies on litigants to tell the truth and participate in discovery in good faith. *Cf. United States v. Turns*, 198 F.3d 584, 587–88 (6th Cir. 2000) ("Our system of justice relies, in large part, on the theory that when a person takes the witness stand and swears to tell the truth, that he or she will in fact do so."); *United States v. Leon–Reyes*, 177 F.3d 816, 823 (9th Cir.1999) ("our [criminal] justice system relies on witnesses telling the truth"); *Doe*, 847 F.2d at 63 (attorney has an ethical duty to disclose a fraud upon the court of which he knows); *Solar Turbines, Inc. v. United States*, 14 Cl.Ct. 551, 553 (1988) ("our system of justice generally relies upon the basic honesty of most individuals, harsh sanctions for perjury, and a panoply of rights concerning discovery and cross-examination"). Thus, when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process, it can fairly be said that he has forfeited his right to have his claim decided on the merits. This is the essence of a fraud upon the court.

---

**12.** In addition, Ms. McMunn has also telephoned the Court eight times during the same

## III. Facts [13]

 As the following discussion will demonstrate, Ms. McMunn has perpetrated a fraud upon this Court. In analyzing Ms. McMunn's various abuses, we follow other courts in our Circuit by considering the following factors: (1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future. *See Skywark,* 1999 WL 1489038, at *15 (collecting cases). As the objects of Ms. McMunn's various misconduct can be organized into categories, we examine each with these enumerated factors in mind.

### A. The Visa Credit Card

As we noted above, Memorial's primary defense to Ms. McMunn's lawsuit is that she was terminated due to repeated unexcused absences from work in the summer of 1994. *See* Transcript of Deposition of Thomas Fahey ("Fahey Dep.") at 94–95, 101–103. Memorial suspected that Ms. McMunn spent some or all of her absences at her house in West Virginia. *See, e.g.,* Transcript of Deposition of Holly McMunn ("McMunn Dep.") at 185:17–18; 5/21/01 Ltr. Accordingly, Memorial sought to discover Ms. McMunn's credit card statements from the summer of 1994 with the expectation that they would show billing activity in West Virginia. Thus, on January 16, 1998, during its first deposition of Ms. McMunn, Memorial questioned her as follows:

Q. Do you have any credit cards that you use for your personal use?

A. I have an American Express card.

Q. Any other cards?

A. No.

McMunn Dep. at 188:17–21

Subsequently, on January 28, 1998, Memorial served a discovery request asking Ms. McMunn to "[i]dentify any other credit or charge cards [other than American Express] held and/or used by plaintiff for the period March 1, 1994 to October 1, 1994 and for each, identify the corresponding account number(s)." *See* Def.'s Reply at 9; 5/15/01 Ltr. Ms. McMunn objected to this request "as not reasonably calculated to lead to the discovery of admissible evidence; interposed for the improper purposes of harassing and invading the privacy of plaintiff; and unreasonable." *Id.* On May 14, 2001, however, McMunn served an interrogatory requesting the same type of credit card information from Dr. Fahey. Memorial objected on the ground that there was no factual dispute as to Dr. Fahey's whereabouts on the dates he alleged Ms. McMunn was absent from work. *See* 5/21/01 Ltr. (Memorial admitting that Dr. Fahey was out of the office on the relevant dates). A phone conference was held on May 30, 2001, in order to resolve these discovery disputes, at which time we ordered Ms. McMunn to respond to Memorial's interrogatory request and disclose any and all credit cards she held or used in the summer of 1994. We also granted Memorial's motion to quash Ms. McMunn's interrogatory request for Dr. Fahey's credit card records because they had no bearing on Ms. McMunn's whereabouts that summer. *See* Order dated May 31, 2001 (granting motion to quash).

Memorial then provided Ms. McMunn with a blank release form entitled "Authorization for Release of Bank Statements/Records and Credit Card

time period.

---

**13.** We find the following facts to be true by clear and convincing evidence, except where indicated.

Statements/Records" to facilitate her compliance with the Court's order. 6/6/01 Fax. Ms. McMunn returned a single signed release addressed to Lincoln Savings Bank in New York, and did not identify any credit card providers, thus implying that she had not held or used any credit cards apart from the American Express card she had previously acknowledged. 7/7/01 Fax.

Memorial nevertheless believed that she may have used another credit card at the time she worked for Dr. Fahey and, accordingly, issued subpoenas to, *inter alia*, First USA Bank, N.A., who produced records for a Visa Gold Credit card (the "Visa Card") issued to Ms. McMunn. These business records clearly establish the following: Ms. McMunn had applied for the Visa Card in October of 1989; statements were mailed to her apartment at 100 West 89th Street in New York[14] from at least May 1996 to October 1998; Ms. McMunn's monthly statements, which showed frequent usage, were paid for by personal checks written and signed by her throughout 1997 and 1998; and the account was "charged off" (closed) in December 1999. *See* Brill Aff. Ex. 19; Brill Supp. Aff. Ex. 19. In fact, these records indicate that the Visa Card had been used (in West Virginia) on January 6, 1998, just twelve days before the deposition in which Ms. McMunn denied the existence of any credit cards apart from her American Express

card, as well as on January 29, 1998, twelve days after that deposition. Brill Aff. Ex. 19.

Memorial confronted Ms. McMunn with this evidence at her July 25, 2001, deposition. First, Memorial showed her a copy of the application for the Visa Card, which we find was completed and signed in her handwriting.[15] McMunn Dep. at 722:19–723:5. Ms. McMunn testified that she had "no idea" whether the document was, in fact, what Memorial claimed it to be, and furthermore that she had "no recollection about this [credit card application] whatsoever." *Id.* at 723:6. Memorial then showed Ms. McMunn copies of Visa Card account statements from December 1997, January 1998, and February 1998, the time of her first deposition. *Id.* at 723:18–25. Ms. McMunn testified in response that she did not "specifically" recall having the Visa Card at that time, and hinted that her husband, who had "falsified and forged [her] signature on any number of cards and purchases," may have forged her signature to obtain the Visa Card.[16] *Id.* at 724:11–14.

In her opposition papers, Ms. McMunn finally admits that she incorrectly stated that she had no credit cards apart from her American Express card at her January 16, 1998 deposition. Pl.'s Opp. at 34 ("[i]n fact, the American Express card is not one, but several that [Ms. McMunn] has had in her name"). Still, she maintained

---

**14.** At the deposition held on January 16, 1998, Ms. McMunn testified that this was her address. McMunn Dep. at 4:9–10.

**15.** Ms. McMunn admitted that the signature on the Visa Card application "[a]ppears to be" her own. McMunn Dep. at 723:11. Moreover, during the course of this litigation, the Court has had many opportunities to read letters written and signed by Ms. McMunn and we find, by a clear and convincing standard, that the signature on the application is that of Ms. McMunn.

**16.** In her opposition papers, Ms. McMunn offers copies of several copies of credit card receipts signed in her name, but clearly in a handwriting that is not her own. Pl.'s Opp. Ex. 32. Only one of these documents, however, shows the name Holly McMunn both typed and signed. Of the remainder, four simply show illegible signatures and no indication that the signature is intended to read "Holly McMunn," and the fifth is clearly signed "Holly McMunn," but does not show the name in type.

that she had no "recollection of having or using" the Visa Card. *Id.* Moreover, she states that "[a]ny payments" made in response to billing statements for the Visa Card "were made from McMunn's mother's account in WV [West Virginia]." Pl.'s Reply at 13. The documents subpoenaed from First USA, however, clearly indicate that the payments were made by personal checks, signed by Holly McMunn, and drawn on bank accounts held at, *inter alia,* Apple Bank and Anchor Savings Bank, both located in New York.[17] Brill Supp. Aff. Ex. 19.

The issue concerning Ms. McMunn's Visa Card, however, goes far beyond her denial of its existence because First USA only maintains records of their credit card statements for five years, at which time they are destroyed in the ordinary course of business. *See* Brill Aff. Ex. 19. Thus, had Ms. McMunn disclosed the existence of the Visa Card at her January 16, 1998, deposition, or, indeed, at any time in the next one and one-half years, Memorial would have been able to obtain the credit card statements from First USA for the weeks and months before she was terminated by Dr. Fahey. Of course, we cannot be certain that this evidence would have proven that she was in West Virginia when she was supposed to be at work,[18] but it is clear that this spoliation of evidence clearly "hinder[ed] the fact finder's fair adjudication of the case and [Memorial's] defense of the action." *Skywark,* 1999 WL 1489038, at *14.

We find that Ms. McMunn lied at her deposition when she denied having any other credit cards, that she did so intentionally and in bad faith, and that her false

testimony directly and irrevocably destroyed potentially critical evidence that, in light of her actions, can reasonably be assumed would have been harmful to her case. As the extant records establish that Ms. McMunn used the Visa Card less than two weeks before she testified to its non-existence, any claim that she merely forgot about the Visa Card is incredible. Moreover, we are also concerned about Ms. McMunn's willingness to testify truthfully going forward given that she has responded to the documentary evidence produced by Memorial by falsely claiming that her husband forged her signature to obtain the Visa Card, and, apparently, that it was he who used it regularly for years.

In sum, we find that Ms. McMunn spoiled highly relevant evidence by, intentionally and in bad faith, concealing the existence of the Visa Card, that this misconduct was highly prejudicial to Memorial, and that the misconduct was never corrected by Ms. McMunn. This is sanctionable misbehavior.

### B. Kevin Keeping

Nearly four years after filing this lawsuit, Ms. McMunn testified as to the significance of Mr. Keeping as a witness:

Mr. Keeping was familiar with many of the circumstances of my employment at [Memorial], if not most or all of the circumstances. And Mr. Keeping in fact was not only familiar with my employment, but he was also familiar with my termination. And Mr. Keeping had picked me up from [Memorial] that day that Dr. Fahey fired me. . . . He knew most everything that occurred [at Memorial] because I discussed it with him.

---

**17.** Furthermore, nearly all the checks are printed with Ms. McMunn's name and former New York address.

**18.** During the time period for which First USA still maintains documents, more than half of the charges on the Visa Card were

made in West Virginia. Brill Aff. Ex. 19. Accordingly, it is reasonable to expect that, had Ms. McMunn been in West Virginia when she was unexcusedly absent from work, the First USA records would indicate activity there.

McMunn Dep. at 501:15–502:1. Despite this, in her response to Memorial's first set of interrogatories, served on December 5, 1997, she did not mention Mr. Keeping in response to questions seeking "each person with knowledge or information concerning" her job performance and the circumstances surrounding her termination. Brill Aff. Ex. 8. Nor did she make any mention of Mr. Keeping at her extensive depositions in 1998. The first time Memorial became aware that Mr. Keeping might have knowledge or information regarding the merits of Ms. McMunn's lawsuit was when he submitted a notarized affidavit in opposition to Memorial's motion for summary judgment in November 1999. *See* Brill Aff. Ex. 4 (Mr. Keeping's November 14, 1999, affidavit).

Memorial's summary judgment motion was founded on the argument that Ms. McMunn was not "disabled" within the meaning of the ADA. Thus, in his affidavit, Mr. Keeping attempted to support Ms. McMunn's contention that she was seriously debilitated by asserting, *inter alia*, that Ms. McMunn was "unable to climb the stairs of the subway and buses" and "unable to walk the distance to the [grocery] store or stand long enough to do her own shopping." *Id.* As to his own relationship with her, he stated that he and his roommate, Albert Bartilotta, were "hired by Holly McMunn ... to drive her to and from work at [Memorial] from the spring of 1991 to the fall of 1994." *Id.* He also stated that he "provided services for her," such as shopping and cooking. *Id.* Be-

cause Memorial reasonably believed that Mr. Keeping would be a material witness, it sought to depose him.

Ms. McMunn, however, was willing to lie, and have others lie for her, to prevent Memorial from deposing Mr. Keeping. At a conference before the Court held on January 5, 2001, Memorial stated that it wanted to depose Mr. Keeping. In response, Ms. McMunn provided an address for Mr. Keeping of "27 West 47th Street, # 15, New York, New York." 4/13/01 Ltr. Memorial, however, was unable to find Mr. Keeping at that address, and again asked McMunn where Mr. Keeping could be found. McMunn indicated that the address she gave Memorial was the one she had been given by Mr. Keeping himself. *See* Pl.'s Opp. at 24; Brill Aff. ¶ 6.

As Ms. McMunn was unable or unwilling to provide further assistance to Memorial, it sought to locate Mr. Keeping on its own. First, Memorial hired a private investigation firm that subsequently obtained Mr. Keeping's driver's license abstract indicating that he lived at 32 West 82nd Street in New York. Brill Aff. Ex. 7. Memorial also sought leads from Ms. McMunn and her son, Cameron McMunn, as to the whereabouts of Mr. Keeping. At a deposition of Ms. McMunn held on July 2, 2001, Memorial questioned her on this subject, but she testified that she had only seen him once in the preceding half year, that she did not know where he was presently located, and that she knew of no address for him apart from the one she had already disclosed.[19]

---

**19.** The deposition transcript reads, in relevant part:

Q. [] Ms. McMunn, when was the last time that you had any contact with Kevin Keeping?
A. It was sometime last year late, I think.
Q. In late 2000?
A. Yes, I think so.
Q. So you haven't seen him this entire year since January 2001?

A. I saw him one—I tried to find out where he was. I gave an address I think to you. And I learned that that address wasn't somewhere where you could find him. And I walked over in that area once and I did see him.
Q. When was that?
A. It was sometime after—I guess you told [my former attorney] that you couldn't find him.
Q. That was several months ago, wasn't it?

McMunn Dep. at 497:16–499:15, 514:10–13, 600:15–17. Similarly, at the deposition of Cameron McMunn held on June 1, 2001 and attended by Ms. McMunn, Cameron McMunn testified that he had not seen Mr. Keeping during the preceding year, and that he did not know his address.[20] C. McMunn Dep. at 56:14–57:12.

Ms. McMunn's and her son's deposition testimony, however, are riddled with falsehoods. Unbeknown to Ms. McMunn, Memorial, skeptical of Ms. McMunn's representations that she had had nearly no contact with Mr. Keeping and did not know where to find him, hired a private investigator to observe and videotape Ms. McMunn. *See* Declaration of Olga French ("French Decl."). The resulting videotape, which was played in open court on July 12, 2001, showed, *inter alia,* Ms. McMunn and Mr. Keeping walking together and entering and exiting 32 West 82nd Street on May 18, 19, June 24, 30, and July 1, 2001.[21] *Id.* Ex. 1. The videotape also showed Cameron McMunn entering and existing that building, often with Ms. McMunn and Mr. Keeping. *Id.* On numerous occasions, it appeared[22] that Ms. McMunn went into the building with Mr. Keeping and did not emerge until the next morning. *Id.* ¶¶ 13–14, 24, 38–39. Moreover, the private investigator

A. It had to have been.
Q. And what was the area that you say you saw him?
A. In the west 40s.
Q. And did you speak to him at that time?
A. Very briefly.
Q. What was the nature of that conversation?
A. I gave him my attorney's name and telephone number.
Q. Did you ask him where he was living?
A. No.
Q. You knew that we were trying to find his address, didn't you?
A. I gave you an address.
Q. Excuse me?
A. I gave you an address that I had for him.
Q. And how did you get the address that you gave to us?
A. How did I get it?
Q. Yes, did you ever know him to live at that address?
A. That was the address I had for him.
Q. [W]e still would like to get Kevin Keeping's address, if there's anyway for you to give that to us.
A. I gave you the address that I had.
Q. [] Do you currently know Kevin Keeping's address?
A. No, I don't know where he is now.
McMunn Dep. at 497:16–499:15, 514:10–13, 600:15–17.

**20.** The deposition transcript reads, in relevant part:

Q. Do you know where [Mr. Keeping and his roommate, Mr. Bartilotta,] are now?
A. No.
Q. Do you remember the last time that they did grocery shopping [for Ms. McMunn]? What year?
A. No, I can't say.
Q. Was it a year ago?
A. I think it was around that time period I gave [earlier in the deposition].
Q. So 1994 you would say was the last time that they did grocery shopping [for Ms. McMunn]?
A. Yes.
Q. Have you seen either of them since then?
A. I don't believe so.
Q. You don't believe so?
A. Again, I can't say for sure. Not recently.
Q. So within the past year you haven't seen either of these people, Mr. Keeping of Mr. Bartilotta?
A. No.
Q. Do you know their addresses?
A. I don't know.
C. McMunn Dep. at 56:14–57:12.

**21.** Ms. McMunn admits that the videotape does, *inter alia,* show her together with Mr. Keeping. *See* Pl.'s Opp. at 22–23.

**22.** The surveillance of Ms. McMunn usually ended by 10:30 p.m. and did not begin until 5:00 a.m., so it is conceivable that she left the building late at night, then returned very early in the morning.

observed Mr. Keeping and Ms. McMunn engage in affectionate physical contact, such as placing their arms around each other, kissing on the cheek, and buttock patting. *Id.* ¶¶ 11, 26. This videotape demonstrates beyond any question that Ms. McMunn and her son were fabricating their deposition testimony, which was taken in the same period as the videotape was recorded. In addition to the videotape, Memorial has presented numerous other pieces of documentary evidence and deposition testimony that tend to show that Ms. McMunn knew quite well where to find Mr. Keeping, but deliberately withheld that information from Memorial, in order to frustrate the latter's attempts to depose him.[23]

All of this evidence make it exceedingly clear that Ms. McMunn did, contrary to her assertions, know that Mr. Keeping lived in apartment 3–B at 32 West 82nd Street. Even after being confronted with the videotape referred to above, Ms. McMunn was undaunted. She subsequently testified that she did not know Mr. Keeping's current residence address, McMunn Dep. at 766:19–21, that she did not know Mr. Keeping's home or cellular telephone numbers, *id.* at 767:5–8, that Mr. Keeping did not, "to [her] knowledge," live at 32 West 82nd Street, *id.* at 744:5–7, and that apartment 3–B is uninhabitable as it "is filled with rats and vermin and [ ] roaches," *id.* at 750:9–10.[24]

Finally, Ms. McMunn attempts to blame the concealment of Mr. Keeping on her previous attorney, Mr. Ireland. *See, e.g.,* Pl.'s Opp. at 21 ("[t]hese misrepresentations [regarding Mr. Keeping's contact information] are those of Mr. Ireland, plaintiff's former attorney") (emphasis omitted);

**23.** Among this evidence is the following:

(1) Mr. Keeping testified in his deposition that he has resided in apartment 3–B at 32 West 82nd Street since 1976, Keeping Dep. at 36:5–10, that he stayed at Ms. McMunn's house in West Virginia for several days during the summer of 2001, *id.* at 26:16–23, 31:14–15, that Ms. McMunn stayed at apartment 3–B "[o]n and off" in the summer and fall of 2001 at his invitation and often while he was there as well, *id.* at 239:17–21, 232:22–233:3. We observe that Mr. Keeping made significant "corrections" to his testimony. *See* Def.'s Ex. 101. As these "corrections" included, *inter alia,* a change from the "[o]n and off" answer quoted above to an answer that would read "On and off. *Not really." Id.* (emphasis indicating corrected answer). We see no reason to credit these changes as truly reflective of Mr. Keeping's originally intended testimony.

(2) Ms. McMunn admitted in her deposition that she has keys to apartment 3–B, McMunn Dep. at 743:18–19, *see also* Pl.'s Opp. at 25 (she had keys to apartment 3–B for ten years), that she had been to that apartment, *id.* at 749:6–7, and that she has stored some of her mother's items as well as her own pets there, *id.* at 733:23–734:5, 735:17–18.

(3) Ms. McMunn was served with a "Summons with Notice" by Mr. Keeping's agent, and this document contained Mr. Keeping's address. Brill Aff. Ex. 10.

(4) An "Emergency/Preadmission Assessment Form" from the Social Work Department at New York–Presbyterian Hospital dated July 14, 2000, indicates that Ms. McMunn provided Mr. Keeping as her "contact," and described him as her "significant other." Brill Aff. Ex. 11.

(5) A "Patient Information" form from Riverside Physical Therapy is signed by Ms. McMunn and lists Mr. Keeping's phone number as a "temporary" phone number for Ms. McMunn. Brill Aff. Ex. 13.

**24.** We acknowledge that with respect to the testimony quoted in note 18, *supra,* Ms. McMunn claimed at a later deposition that she "did not have the opportunity to completely testify on that matter," and that, given the opportunity, she would have testified that she had seen Mr. Keeping on more than one occasion. McMunn Dep. at 754:10–24. We reject this explanation as both inconsistent with the transcript, *see* note 19, *supra,* and with our repeated observations of Ms. McMunn who is assertive and persistent, and hardly cowed by the legal process. *See, e.g.,* McMunn Dep. at 595:20–596:14.

*see also, e.g.,* Keeping Dep. at 23:10–24:7 (testifying that Mr. Ireland intentionally avoided learning Mr. Keeping's address). This argument is unavailing, however, as she is held accountable for the acts or omissions of her freely-chosen attorney. *Link v. Wabash R. Co.,* 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).

In conclusion, we find that Ms. McMunn repeatedly lied and misled Memorial in an intentional effort to prevent it from deposing Mr. Keeping. Furthermore, we find that were it not for Memorial's extensive investigative efforts that Ms. McMunn would likely have succeeded. Further, Ms. McMunn has never corrected her false testimony, but rather, continues to compound her contumacious conduct by denying the obvious fact that she knew Mr. Keeping's address and phone number throughout this litigation but refused to disclose it. *See* Pl.'s Opp. at 24 ("While Mr. Keeping may live at 32 West 82nd Street, ... that is not one of the address[es] he provided to plaintiff"); Pl.'s Reply at 5 ("Defendant has failed to substantiate that plaintiff knew that Keeping lived in apartment 3–B."). To put it simply, we find that Ms. McMunn lied, was caught in her lies, and continues to lie.

## C. Audio Tape Recordings

Ms. McMunn made audio recordings of telephone conversations she had with various Memorial employees following her termination for the purpose of preserving evidence to be used in potential litigation

against Memorial. McMunn Dep. at 47:4–25, 51:13–17, 53:15. She did so without the knowledge or consent of those being recorded. *Id.* at 50:5–12. During the course of discovery, Ms. McMunn produced six tapes to Memorial. Tape One was delivered to Memorial on December 5, 1997, Tape Two and Tape Three on February 25, 1998, Tape Four on March 7, 2001, and Tape Five and Tape Six on July 10, 2001. *See* Declaration of Ernest Aschkenasy ("Aschkenasy Decl.") ¶ 6. Memorial hired an expert on audio tapes, Ernest Aschkenasy,[25] to determine the authenticity of these tapes. *See id.* Although Ms. McMunn denies editing the tapes, McMunn Dep. at 659:1–17; Pl.'s Reply at 14, Mr. Aschkenasy has analyzed them and concluded that all the tapes, with the possible exception of Tape Six, are not original recordings, but rather have been edited. Aschkenasy Decl. ¶¶ 13, 19, 24, 28, 30, 34.

Mr. Aschkenasy declares that "the recorded material [on Tape One][26] is a copy of a number of distinct segments of recordings of unknown origin that were ultimately copied onto [Tape One]." Aschkenasy Decl. ¶ 10. In support of this contention, Mr. Aschkenasy notes that there are clearly audible "recording breaks" on Tape One. *Id.* ¶ 13. The number and quality of these recording breaks, moreover, cannot be explained by the recording device falling off the telephone receiver, or the flipping of the original as

---

**25.** Mr. Aschkenasy holds Bachelor's and Master's degrees in Electrical Engineering and is one of the most well-respected audiotape experts in the country. He has testified, *inter alia,* before Congress in its investigation of the assassination of President Kennedy, and participated in the analysis of the Watergate tape recordings. *See United States v. Gerena,* 695 F.Supp. 649, 667–68 (D.Conn.1988).

**26.** Tape One purportedly contains a single conversation between Ms. McMunn and Mike

Browne, Memorial's Vice President of Human Resources, that took place about a week after Ms. McMunn's termination in September 1994. Tape One, as produced in discovery by Ms. McMunn, however, is a TDK brand cassette that was manufactured in 1997. *See id.* ¶ 9. Accordingly, it could not possibly be the original recording from 1994. Ms. McMunn acknowledges that she copied the tapes, however, which would explain this discrepancy. McMunn Dep. at 659:4.

it was being recorded, as postulated by Ms. McMunn, because there is no need to stop the recording if the device falls off and because flipping only occurs once per tape. *See* McMunn Dep. at 55:8–18; Aschkenasy Decl. ¶¶ 15–16.

Tape Three includes another conversation between Ms. McMunn and Mr. Browne. A more complete version of the same conversation is also found on Tape Four, which was produced by Ms. McMunn more than three years after she produced Tape Three.[27] Aschkenasy Decl. ¶ 28; Brill Aff. Ex. 35. First, as the portion of the conversation that is missing on Tape Three is in the middle, rather than at the beginning or end, it establishes that Tape Three was intentionally edited before being produced in discovery. Second, the portion of the conversation that is missing from Tape Three is almost wholly devoted to Mr. Browne explaining to Ms. McMunn that she is very unlikely to be rehired by Memorial and that she should look for a position elsewhere. Brill Aff. Ex. 35 at 4–5 (Mr. Browne discussing budget cuts); *id.* at 7 (Mr. Browne stating, "there are not a lot of positions [for you]"); *id.* at 10 (Mr. Browne inquiring as to whether Ms. McMunn was "aggressively pursuing other options").

Significantly, the omitted portion from Tape Three contradicts the claim in Ms. McMunn's Complaint that Mr. Browne had told her that she would be rehired by Memorial after her termination. Compl. ¶ 27. Moreover, whether Ms. McMunn actively sought employment after being terminated by Memorial, and whether and to what extent she could have reasonably relied on any representation of Mr. Browne, are both highly relevant to her potential damages in this suit. *See Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 53 (2d Cir.1998) (because "[v]ictims of employment discrimination are required to mitigate their damages," a "discharged employee must 'use reasonable diligence in finding other suitable employment'") (quoting *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231–32 & n. 15, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982)). Ms. McMunn not only claims not to have been employed in any capacity since her termination from Memorial, but also attributes that to her reliance on alleged assurances by Memorial. Brill Aff. Ex. 8 (Plaintiff's Response to Defendant's First Set of Interrogatories) at ¶¶ 25–26. Accordingly, Ms. McMunn had an obvious motive to edit that portion of the conversation where Mr. Browne informs her that she is unlikely to be rehired by Memorial.

Ms. McMunn counters on two fronts. First, she observes that Mr. Browne has not suggested that the taped conversation does not comport with his recollection of that conversation. Pl.'s Opp. at 37–38. As Memorial points out, however, it is hardly surprising that Mr. Browne's recollection of a single telephone conversation that took place more than five years earlier is imperfect. Second, Ms. McMunn hints that one or more of her (or Memorial's) lawyers may have edited the tapes without her knowledge. Pl.'s Opp. at 36; *id.* at 37 (because the tapes were "provided by plaintiff to her first attorney[, she] has no knowledge of ... the way in which they were turned over" to Memorial; Ms. McMunn "does not know all of the people who handled these tapes and potentially might have reproduced them"); *id.* at 38 (Ms. McMunn "wonders if [the tapes] were tampered with by other people in whose hands they reside"); Pl.'s Reply at 13 ("Once out of her hands, [Ms.] McMunn cannot have knowledge about how others

---

27. Further, even combining the recordings from Tape Three and Tape Four does not yield a complete recording of the relevant conversation, however. Aschkenasy Decl. ¶ 23.

tampered with them, including any claimed alterations, discrepancies or omissions."); *id.* at 14 ("If others destroyed or discarded segments [of the tapes], it was at the hands of others."). Ms. McMunn offers nothing beyond sheer speculation to attribute misconduct to her counsel but, in any event, any misconduct or spoliation of evidence by her attorney is imputed to her. *Link,* 370 U.S. at 633–34, 82 S.Ct. 1386. Notably, Ms. McMunn does not challenge the conclusion of Mr. Aschkenasy that Tape Three contains a purposefully edited version of a conversation also found on Tape Four.

Since Memorial has satisfactorily demonstrated that it did not edit the tapes after receiving them from Ms. McMunn or her attorneys,[28] we find by clear and convincing evidence that Ms. McMunn (or her counsel acting on her behalf) edited the tapes so that they would provide stronger evidence in support of her lawsuit than do the unedited originals. Moreover, Ms. McMunn has represented that she gave the "original[s]" to Memorial during discovery and that she has produced all the tapes she has. Brill Supp. Aff. Ex. 26 (11/23/98 Ltr.); Pl.'s Reply at 14. Accordingly, Ms. McMunn has intentionally spoiled relevant evidence, and, as even she recognizes, this is a "serious error." Pl.'s Reply at 14; *see generally West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999).

In short, we find that Ms. McMunn spoiled relevant tapes she produced to Memorial, and that this spoliation prejudiced Memorial's ability to demonstrate a lack of mitigation by Ms. McMunn. We conclude that this spoliation of evidence should be sanctioned.[29]

## D. Apartment Sale

Ms. McMunn sold her Upper West Side apartment for $610,000 in October 2000.[30] She claims that she did so in order to pay off creditors, following the posting of several sheriff's notices on her door notifying her of an impending forced sale for the purpose of satisfying these creditors. Pl.'s Opp. at 25–31.[31]

---

**28.** *See* Brill Supp. Aff. ¶¶ 23–24; *id.* Ex. 25 (transcriptions of Tape One made by Memorial and by McMunn are nearly identical).

**29.** While Ms. McMunn may have partially corrected her misdeeds by providing Memorial with Tape Four three years after producing Tape Three, she continues to try to lay blame for the editing on everyone except herself. *See* Pl.'s Opp. at 36–39; Pl.'s Reply at 13–14.

**30.** She apparently did not move out of the apartment until January 2001, however. In a letter dated January 7, 2001 from Ms. McMunn to Memorial, she requested, *inter alia,* that copies of certain deposition transcripts be provided to her, and she included the address of her apartment as the letterhead. 1/7/01 Ltr. She offered no indication whatsoever that she would be moving from that address in the near future. *Id.* Thus, Memorial sent her a letter by overnight mail service on January 9, 2001, which was returned to sender. *See* 1/12/01 Ltr. Memorial then re-sent the letter by hand-delivery, along with another letter in response to her letter of January 7. *Id.* Finally, on January 12, a messenger hired by Memorial who attempted to deliver a package to her at her apartment was told that she had moved. *See* 1/15/01 Ltr. Without any way to contact her, Memorial sent another letter to Ms. McMunn's apartment requesting that she call them, and also left a message on her answering machine. *Id.* On January 15, Ms. McMunn called Memorial and told them her new mailing address, a post office box. *See* 1/18/01 Ltr.

**31.** Memorial postulates, however, that this was a sham transaction entered into for the purpose of hiding Ms. McMunn's assets from her husband, with whom she was engaged in state court divorce proceedings. Memorial has presented compelling evidence that demonstrates that the proceeds of the sale of Ms. McMunn's apartment did not go to creditors, but rather, ended up in her own hands. While Memorial's theory is logical and supported by the undisputed fact of Ms. McMunn's pending divorce proceeding, we nonetheless have insufficient evidence to find

Ms. McMunn has claimed all along that numerous creditors with liens against her apartment received all the proceeds of its sale and that she received nothing. *E.g.,* McMunn Dep. at 550:12–14. While she initially testified that as many as ten creditors had judgments against her, *id.* at 488:9–11, she later shortened this list to three. *Id.* at 489:6–16. The claimed debts are for (1) $13,009.70, owed to Aaron Weitz, one of Ms. McMunn's numerous lawyers, for legal fees, (2) approximately $23,000, owed to Kenneth Burrows, another of her lawyers, also for legal fees, and (3) for $610,000 plus interest, owed to Mr. Keeping. Ms. McMunn has produced state court judgments for the debts owed to Mr. Weitz and Mr. Keeping, *see* Pl.'s Opp. Ex. 22 and Brill Aff. Ex. 10.

The debt she claims to have owed to Mr. Keeping, however, is highly suspect. At her deposition held on July 2, 2001, she testified as follows:

Q. What was the nature of Mr. Keeping's lawsuit against you for which he obtained a judgment?

A. Mr. Keeping and a few of his partners [significant others][32] had loaned me money to survive.

Q. How much money had he loaned you?

A. It was several hundred thousand dollars. I don't recall the exact amount.

\* \* \* \* \* \*

Q. When was that money loaned to you?

A. Oh, it's been over the course of a number of years.

Q. You say some of his partners. Who else was involved in loaning you that money?

A. I think that all the notes were all in Mr. Keeping's name, although there was—I don't think anybody else was involved directly. No one else's name was on paper, to my recollection.

Q. You say there are notes. These debts were evidenced by notes?

A. I signed notes. . . .

Q. Do you have copies of the notes that you signed?

A. Probably not. Not anymore.

\* \* \* \* \* \*

Q. Did you contest his claims against you?

A. No.

McMunn Dep. at 490:15–491:18, 494:4–6. Ms. McMunn has not produced a single note evidencing any debt whatsoever to Mr. Keeping. Memorial, however, obtained from the New York State Supreme Court clerk's office a single note evidencing Ms. McMunn's debt to Mr. Keeping. *See* Brill Aff. Ex. 10 at 9. This note, in the amount of $610,000, is dated March 1, 2000, signed by Ms. McMunn, is due on June 1, 2000, and provides for 18% interest. *Id.* Coincidentally, or perhaps not, Ms. McMunn sold her apartment on October 26, 2000 for exactly the amount of this note—$610,000. *See* Brill Aff. Ex. 16 at 2 (closing statement).

All the evidence produced indicates that the sale of Ms. McMunn's apartment was, indeed, a sham transaction. First, there is

a motive for the sham transaction by a clear and convincing standard. In any event, as Ms. McMunn has claimed that her termination by Memorial resulted in a downward financial cycle which left her homeless, her misconduct and lies with respect to the sale of her apartment are part and parcel of her

fraud upon this Court. *See* Pl.'s Reply at 11 ("[Ms.] McMunn's indebtedness arose after her wrongful termination [by Memorial] in 1994 and she was forced into this economic hole due to her lack of income.").

**32.** *See* McMunn Dep. at 505:3–8.

the suspicious nature of the note evidencing Ms. McMunn's debt to Mr. Keeping. Even assuming that Ms. McMunn borrowed hundreds of thousands of dollars from a personal friend, it seems unlikely that such a friend, after taking no steps towards collection for years, would suddenly make the entire debt due in one month, provide for a nearly-unconscionable 18% interest if Ms. McMunn were unable to pay by that time, and then serve her with a default judgment on the note less than three weeks after the amount came due.[33] Second, there is the fact that Ms. McMunn sold her apartment for the exact amount of the note. Third, the closing statement indicates that neither Mr. Weitz nor Mr. Burrows received any of the money obtained from the buyer, but rather that Mr. Keeping was the only creditor who benefitted from the apartment sale. *See* Brill Aff. Ex. 16.[34]

Furthermore, once he received the money, Mr. Keeping deposited it in a business checking account for a company he owned. *See* Brill Aff. Ex. 17 (bank record showing Mr. Keeping's account being credited $559,482.12 the day after the closing). Two weeks later, on November 13, 2000, Mr. Keeping wrote a $135,000 check from this account to Ms. McMunn's son, Cameron. *Id.* Mr. Keeping also added Cameron McMunn as a signatory to this account in November 2000. *Id.* Moreover, he wrote six large checks from this account made out to himself over the next few months in a total amount of $237,000. *Id.* Finally, in December 2000 and January 2001, Mr. Keeping wrote no fewer than sixteen checks made out to "Cash," fourteen of them for $9,000, and two for $8,500.[35] *Id.* The end result of these transactions is that approximately $515,000 of the approximately $560,000 [36] deposited in Mr. Keeping's business account from Ms. McMunn's apartment sale on October 26, 2000, was withdrawn from that account in the ensuing three months. *Id.* This pattern of check writing for someone who estimates his total net worth to be about $200,000, and who has offered no business explanation for the expenditures, is certainly out of the ordinary. Keeping Dep. at 134:21–135:3; Brill Aff. Ex. 17.

Other evidence uncovered by Memorial demonstrates that the money obtained from the sale of her apartment, funneled through Mr. Keeping's business checking account and Cameron McMunn, was effectively returned to Ms. McMunn.[37] Cameron McMunn deposited the $135,000 check Mr. Keeping had written him in his check-

---

**33.** This is particularly out of character for Mr. Keeping, who has no history of litigiousness. In fact, although he owned his own business for nearly twenty years, he has never, apart from the judgment he obtained against Ms. McMunn, been involved in any lawsuits whatsoever. Keeping Dep. at 21:8–15.

**34.** The debts owed to Mr. Weitz and Mr. Burrows were paid by Cameron McMunn. Brill Supp. Aff. Ex. 13 (check from Cameron McMunn to Aaron Weitz for $10,525.00); *id.* Ex. 14 (check from Cameron McMunn to Kenneth Burrows for $22,570 and cover letter indicating that this payment satisfied his judgment against Ms. McMunn).

**35.** The checks for $8,500 are dated December 4 and 12, 2000, and the checks for $9,000 are

dated December 14, 18, 19, 21, 21, 22, 28 and January 3, 4, 16, 17, 22, 24, 25, 2001. Brill Aff. Ex. 17. We observe that federal regulations require financial institutions to report transactions involving more than $10,000, which may provide an explanation as to why Mr. Keeping wrote many relatively small checks over a short period of time rather than a lesser number of larger checks. 31 C.F.R. 103.22(b)(1); *See United States v. Winfield*, 997 F.2d 1076, 1078 n. 1 (4th Cir.1993).

**36.** This represents 92% of the total.

**37.** Ms. McMunn denies receiving any money from the sale of her apartment. McMunn Dep. at 487:14–16.

ing account on November 13, 2000. Brill Supp. Aff. Ex. 5. Over the next eight months, dozens of checks were written from this account to Ms. McMunn's doctors, physical therapists, and others to whom she apparently had payment obligations.[38] Id. (check numbers 125, 127, and 128 indicate on their face that they are paid on behalf of Ms. McMunn). In fact, one of the checks drawn on Cameron McMunn's account is for $1,000 to be paid to Andrew Levin, M.D., who McMunn had intended to retain as an expert in this case. See id.; 6/6/01 Ltr.

Furthermore, it is clear to the Court that several of these checks were actually written out by Ms. McMunn, though not signed by her. Compare, e.g., Brill Supp. Aff. Ex. 6 (letter handwritten by Ms. McMunn) and id. Ex. 7 (letter handwritten by Cameron McMunn) with id. Ex. 5 (check numbers 96, 98, 109–113, 115, and 128 written in Ms. McMunn's handwriting). Cameron McMunn also wrote a check dated November 22, 2000, for approximately $71,000, to be deposited into his Charles Schwab account. Brill Supp. Aff. Ex. 5 (check no. 108). Notably, Ms. McMunn had previously transferred substantially the entire balance of her own Charles Schwab account to that of Cameron McMunn, and, moreover, Ms. McMunn held a power-of-attorney over her son's account. McMunn Dep. at 781:11–21, 784:16–23; Brill Supp. Aff. Ex. 5. Indeed,

by the summer of 2001, nearly all of the $135,000 from Mr. Keeping had been withdrawn from Cameron McMunn's account. Brill Supp. Aff. Ex. 5.

Ms. McMunn and Mr. Keeping, for their part, assert that there was nothing more to the sale of Ms. McMunn's apartment than that she had creditors who were about to force a sale of her apartment, but was able to sell it herself, pay off her creditors, and be free of debt. As to the motive for this sham transaction, Ms. McMunn asserts in her memorandum that while Memorial "muses that plaintiff sold [her] apartment due to a marital action[, n]othing could be further from the truth[, because Ms.] McMunn's residence is protected by a premarital agreement executed in 1992." Pl.'s opp. at 26. Despite attaching forty-four exhibits to that memorandum, Ms. McMunn did not attach a copy of this alleged premarital agreement, nor has she produced it to Memorial or the Court in any other context. In their attempt to explain how the funds received for the apartment appear to have been returned to Ms. McMunn, she and Mr. Keeping offer an unlikely story involving Ms. McMunn's mother's intention that Mr. Keeping hold her life savings for the benefit of Cameron McMunn.[39] Neither the timing nor the amounts involved, however, substantiate their fantastic story.

---

**38.** In addition, there is one check dated November 22, 2000 for $60,000, written to Mr. Keeping's business checking account. Brill Supp. Aff. Ex. 5.

**39.** Essentially, they claim the following: Ms. McMunn had had a falling out with her mother, Alice McMunn, that led the latter to distrust Ms. McMunn's ability to manage finances. Alice McMunn, however, wanted to be sure that Cameron McMunn, her grandson, would receive his proper inheritance from her. Accordingly, Alice McMunn gave Mr. Keeping $200,000 in cash, without any

documentation whatsoever, to hold for the benefit of Cameron McMunn. Keeping Dep. at 124:17–25. Mr. Keeping took the cash and placed it in a vault. Id. at 125:5–13. Later, Mr. Keeping told Cameron McMunn about the money, and wrote him the $135,000 check as a partial payment, because Cameron was uncomfortable with receiving all $200,000 at once. Id. at 135:19–24. Mr. Keeping then added Cameron McMunn as a signatory to his business checking account so that, "if anything happened" to Mr. Keeping, he would be able to access the money left for him by his grandmother. Id. at 135:7–12.

Clinging to this thin reed, however, Ms. McMunn professes that she is "unaware" of the financial transactions of Mr. Keeping and Cameron McMunn. Pl.'s Opp. at 28; *See also* Pl.'s Reply at 9 ("[Ms.] McMunn is unaware of Cameron's financial transactions insofar as he will be 21 years old in a few weeks. He lives a life of his own."). We have found, however, that she has written out many checks signed by Cameron McMunn and paid out of his account, and that Cameron McMunn paid the debts Ms. McMunn owed to Mr. Weitz and Mr. Burrows. Furthermore, there is incontrovertible documentary evidence that Ms. McMunn holds a power-of-attorney over Cameron McMunn's Charles Schwab account, Brill Aff. Ex. 36, and that she and her son were joint account holders of a bank account at a West Virginia bank.[40] Brill Supp. Aff. Ex. 12.

In conclusion, we find, by a clear and convincing standard, that Ms. McMunn's sale of her apartment was a sham transaction. Moreover, we find that she has never even attempted to correct this misbehavior by confessing the truth about the apartment sale to this Court. While her lying and scheming with respect to her apartment sale do not go to the substantive merits of her claims against Memorial, they would have impacted the factfinder's ability to make a fair determination of the consequences of her termination, had she proved her case at trial, as the next section of this opinion makes clear.

### E. Claims of Homelessness

Ms. McMunn claims to have been homeless since she was "forced" to sell her apartment. Pl.'s Reply at 8; *see* Part III.D, *supra.* Memorial claims that this is a lie "intended to perpetuate the impression that she has been left destitute as a result of Memorial's termination of her employment, thereby enhancing her claims for emotional distress damages." Def.'s Mem. at 9; *see* Compl. ¶ 29 ("plaintiff has suffered severe emotional pain and suffering" as a result of her termination). We agree with Memorial that Ms. McMunn intentionally and in bad faith attempted to deceive it and the Court into believing that she is homeless.

At her first deposition following the sale of her apartment, Ms. McMunn testified that she was homeless:

Q. Where are you living?

A. I'm not living anywhere particularly. I'm just staying in different places.

 \* \* \* \* \* \*

Q. Where did you stay last night?

A. As a matter of fact, last night I stayed at the—a hotel on 42nd and Lexington. I believe it's called the Sheraton.

 \* \* \* \* \* \*

Q. . . . You mentioned a few minutes ago that you stayed last night in a hotel on 42nd and Lexington. Is that where you stayed for the last week?

A. No.

Q. Can you tell me where you stayed over the last week? Today is July 2nd[, 2001]. ·I'd like to know where you stayed beginning last weekend through -

A. Mr. Brill, because I've lost my home and my son has lost his home, and

---

40. Moreover, in her opposition papers, Ms. McMunn contradicts her own claims of ignorance of her son's financial affairs: "When [Ms.] McMunn testified that she had 'no idea' whether Keeping and her son had any transactions between themselves, she was totally truthful. Today, she can state that she is absolutely certain that none of the proceeds of the [apartment] sale went to her son Cameron." Pl.'s Opp. at 30 (emphasis supplied).

because I've had no place to stay, *I have been placed by people affiliated with the Coalition for the Homeless. And I've been staying in designated places.*

Q. Can you tell me every place you've stayed over the last week?

A. No.

Q. You can't tell me?

A. No. I won't tell you.

[Ms. McMunn conferred with counsel for fourteen minutes]

Q. The [pending] question is where you've been staying over the last week, Ms. McMunn.

A. Mr. Brill, I have not had any place to stay. I've been staying more or less *in hotel lobbies,* I stayed one—I believe this past week I stayed one night in Grand Central Station area. *I don't have a home, and so I don't stay in a home or an apartment.* That's about the best I can answer.

\* \* \* \* \* \*

Q. Just to be sure that we understand. In the last week, and I'll state beginning Friday, June 22nd through last night, are there any friends that you've stayed with?

A. No.

Q. Or in anyone else's apartment?

A. No.

41. With respect to this last portion of the videotape, Mr. Keeping testified as follows:
Q. We're still asking about June 30th, the last tape that we watched. You and Ms. McMunn returned to your building as shown and went inside together [at 5:07 p.m.].
A. Uh-huh [Yes].
Q. Did she come up to her apartment?
A. No.
Q. Did you ask her where she was going in the building?
A. Not that I recall.
Keeping Dep. at 224:6–15. Mr. Keeping and Ms. McMunn were together for several hours

McMunn Dep. at 485:11–14, 485:21–24, 494:13–496:21 (emphasis supplied), 497:5–11.

Ms. McMunn's testimony is refuted, however, by the videotape evidence obtained by Memorial's private investigator. On July 1, 2001, the date on which Ms. McMunn testified that she stayed at a Sheraton hotel, Ms. McMunn was videotaped entering Mr. Keeping's apartment building with him at 5:45 p.m., and did not leave at any time prior to 10:00 p.m., when surveillance was terminated for the evening. French Decl. ¶¶ 41–42. Furthermore, in the week prior to her deposition, Ms. McMunn was observed on other occasions entering and exiting Mr. Keeping's building at times that suggest that she stayed there overnight. *Id.* ¶¶ 25–26 (surveillance began at 7:00 a.m. on a Sunday morning; Mr. Keeping and Ms. McMunn exited Mr. Keeping's building at 9:27 a.m.), 33–34 (surveillance began just after 5:00 a.m. on a Saturday morning; Ms. McMunn exited Mr. Keeping's building at 9:22 a.m.), 38–39 (Ms. McMunn and Mr. Keeping entered Mr. Keeping's building at 5:07 p.m. and did not leave before surveillance ended at 9:00 p.m.).[41]

Even after being confronted with this evidence,[42] Ms. McMunn continued to lie and claim that she was homeless. At her July 25, 2001 deposition, she testified as follows:

that afternoon, took the subway together, put their arms around each other, and, finally went back to Mr. Keeping's apartment building together. French Decl. ¶¶ 37–38. For him to suggest, under oath, that they parted ways in the lobby without Ms. McMunn offering a word as to where she was going is nothing short of offensive.

42. In addition to the surveillance evidence just discussed, much of the evidence of her relationship with Mr. Keeping, *see* Part III.D, *supra,* also undercuts her claims of homelessness.

Q. [W]here have you been *staying overnight* since you were last deposed on July 2nd?

A. I can't tell you specifically on certain nights. I can tell you that I have stayed in *churches*. I can tell you that I have stayed in *Riverside Park*. And I can tell you that I have been in *Central Park*. And I can tell you that I have been in the dorm at F.I.T. [Fashion Institute of Technology.] And I can tell you that I stayed in the basement at West 82nd Street [Mr. Keeping's apartment building].

McMunn Dep. at 769:4–13 (emphasis supplied); *see also id.* at 772:9–773:11, 773:22–25. The day before that deposition, however, Ms. McMunn was observed leaving Mr. Keeping's apartment building at 9:10 a.m. (surveillance began at 5:30 a.m.) and entering the building at 4:00 p.m. (surveillance ended at 10:00 p.m.). French Decl. ¶¶ 53–54, 61, 63. The very day of her deposition, she was videotaped entering Mr. Keeping's building at 9:30 p.m., carrying a pizza box, and her son entered the building shortly thereafter. *Id.* ¶ 70. She did not leave the building before 12:30 a.m. that night, at which time surveillance was concluded, and was next observed leaving the building at noon the next day. *Id.* ¶¶ 71, 74. Finally, we note that Mr. Keeping himself testified on November 9, 2001 that he lives in apartment 3–B at 32 West 82nd Street and that Ms. McMunn had

stayed in that apartment "[o]n and off." 36:5–10, 229:19–21.[43]

Ms. McMunn attempts to explain away this mountain of evidence by claiming that she stayed with Mr. Lenny Haywood, who also lived at 32 West 82nd Street on the dates she was observed entering that building. *E.g.*, McMunn Dep. at 727:9–18; Pl.'s Opp. at 25; Pl.'s Reply at 8. First, this is an admission that she lied when she testified that she had not stayed at the apartments of "anyone else." McMunn Dep. at 497:10–11. Second, as she admits that Mr. Haywood died before July 4, 2001, her claims to have stayed with him after that time ring hollow. Pl.'s Reply at 8.

In conclusion, we find, by a clear and convincing standard, that Ms. McMunn intentionally and in bad faith repeatedly lied about where she was living for the purpose of unfairly bolstering her claim that her termination by Memorial has left her destitute and with severe emotional damages. Only Memorial's extraordinary efforts and related expenses revealed the elaborate fabrication. As is her pattern, Ms. McMunn eschews corrective measures even when confronted with irrefutable evidence of her lies. Once again, Ms. McMunn's behavior is clearly sanctionable.[44]

## IV. Appropriate Sanction

 As the preceding discussion makes plain, we find that Ms. McMunn's outra-

---

43. See note 23, *supra.*

44. We have found all the facts in Parts III.A–E by a clear and convincing standard. In addition, Memorial has put forth a significant amount of evidence that tends to show that Ms. McMunn: (1) stole her medical file from Memorial; (2) forged a document that, if authentic, would provide substantial support for her claims; and (3) repeatedly lied about and concealed bank accounts, brokerage accounts, and tax filings. *See* Def.'s Mem. at

21–23, 23–24, and 14–16. While we would likely find that Ms. McMunn engaged in these further misdeeds by a preponderance of the evidence, we are not prepared to say that Memorial has succeeded in proving these allegations clearly and convincingly. Accordingly, having found the five categories of wrongdoing already discussed sufficient to support the severest of sanctions, we neither address nor rely upon these additional claims. *See* Parts III.A–E, *supra.*

geous misbehavior in this case rises to a level that constitutes a fraud upon this Court. We must now determine the most appropriate sanction to impose. In doing so, we consider the five factors enumerated above: (1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future. *See Skywark*, 1999 WL 1489038, at *15 (collecting cases). In addition, following the approach recently endorsed by the Second Circuit in the spoliation context, we arrive at a sanction that will (1) deter parties from engaging in the sort of misbehavior of which Ms. McMunn is guilty; (2) "place the risk of an erroneous judgment on the party who wrongfully created the risk;" and (3) restore Memorial to the position it would have been absent the wrongdoing of Ms. McMunn. *Goodyear*, 167 F.3d at 779. Memorial seeks two types of sanctions, namely, that we dismiss Ms. McMunn's claims against it with prejudice, and that we award it monetary sanctions based upon the costs and expenses it incurred as a result of her misconduct. Def.'s Mem. at 26.

As we noted earlier, we rely on the "inherent power" of this Court to sanction Ms. McMunn. Nearly two centuries ago, the Supreme Court wrote, "Certain implied powers must necessarily result to our Courts of justice from the nature of their institution," and these "powers [ ] cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812); *see also Chambers*, 501 U.S. at 43–46, 111 S.Ct. 2123. Among these "inherent pow-

ers" is the power to dismiss a suit with prejudice without reaching the merits, in appropriate cases. *See Link*, 370 U.S. at 632, 82 S.Ct. 1386 (dismissal with prejudice is proper under district courts' inherent powers when plaintiff fails to prosecute); *Mallard v. United States Dist. Ct. for the S.D. of Iowa*, 490 U.S. 296, 308–09, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989) (district court would have inherent power to dismiss with prejudice when plaintiff's suit is frivolous or malicious even without statutory authorization) (dicta).

■ We acknowledge that dismissal is a harsh sanction to be used only in extreme situations. *E.g., Valentine v. Museum of Modern Art*, 29 F.3d 47, 49 (1994). When faced with a fraud upon the court, however, such an powerful sanction is entirely appropriate. *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989) ("we find it surpassingly difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process—to combat those who would dare to practice unmitigated fraud upon the court itself"); *see also, e.g., Skywark*, 1999 WL 1489038, at *1 (granting motion dismissing case for fraud upon the court); *cf. Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (vacating a judgment twelve years after it became final for fraud upon the court).

There can be no doubt that Ms. McMunn has abused the judicial system from which she sought relief, and consideration of all the factors enumerated above reinforce this conclusion. First, we find that she acted intentionally and in bad faith. Second, her actions prejudiced Memorial by seriously impeding its ability to obtain relevant discovery as well as by forcing it to expend a tremendous amount of money and time both in trying to defend the merits of Ms. McMunn's employment discrimination claims as well as in proving

that she engaged in unfair litigation practices. Third, it is obvious that Ms. McMunn's actions constitute a pattern of misbehavior rather than an isolated instance. Fourth, Ms. McMunn has not even attempted to correct the vast majority of her deceptive conduct.[45] Fifth, and perhaps most importantly, it is clear that Ms. McMunn's lies and misconduct will almost certainly continue in the future if this action is permitted to go forward, thus nullifying any chance for a fair adjudication of the merits of her claim. She has shown no remorse for her deceptions, offered no apologies for her lies, and never corrected her misstatements. In short, she deserves to be punished severely for perpetrating a fraud upon this Court.

Indeed, she deserves the harsh sanction of dismissal with prejudice. In reaching the conclusion that dismissal is the proper remedy, we considered the feasibility and effectiveness of lesser sanctions.[46] We found, however, that a lesser penalty, such as a jury instruction, would be ineffective as a sanction for Ms. McMunn's dishonest behavior, which pervades every aspect of this case. Ms. McMunn has lied and convinced others (Mr. Keeping and Cameron McMunn) to lie. She has altered, destroyed, and otherwise spoiled evidence. She has concealed the whereabouts of a material witness. There can be no doubt that she has irrevocably tainted these proceedings.

Furthermore, we considered whether a large monetary sanction alone would be an adequate sanction. We concluded that such an award would be a hollow victory for Memorial, as it would likely be uncollectible. Ms. McMunn has already exhibited manipulative financial behavior and has not hesitated to lie with respect to he misconduct. Thus, a monetary sanction that represents the additional costs, fees, and expenses incurred by Memorial due to Ms. McMunn's misbehavior, therefore, would not sufficiently punish her, nor would it remove the taint from this case. Nevertheless, in light of the magnitude of the additional costs and expenses she imposed on Memorial through her misconduct, we feel that she should pay for at least part of the costs she caused Memorial to incur.[47] Accordingly, we award a monetary sanction against Ms. McMunn in the amount of $20,000, to be paid to Memorial.

## CONCLUSION

For the foregoing reasons, we hereby dismiss Ms. McMunn's complaint against Memorial with prejudice. Furthermore, we order Ms. McMunn to pay Memorial $20,000 with interest accruing from the date of this Memorandum and Order.

**IT IS SO ORDERED.**

\* \* \* \* \* \*

\* \* \* \* \* \*

\* \* \* \* \* \*

---

45. Of course, when her misconduct resulted in the spoliation of evidence, there is no way to correct her misdeeds.

46. We were also mindful that "the most severe in the spectrum of sanctions must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976).

47. While Memorial has not submitted documentation that would permit the Court to accurately determine the amount of money that Ms. McMunn's misconduct caused them to expend, the Court takes judicial notice that it is almost certainly upwards of $50,000, and possibly much more.