THIS OPINION
IS A PRECEDENT OF THE
TTAB

Mailed: September 10, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Optimal Chemical Inc.*

*v.*

*Srills LLC*

————

Cancellation No. 92063200

————

Adam S. Goldman of The Concept Law Group PA,
   for Optimal Chemical Inc.

Kenneth L. Kunkle of Kunkle Law PLC,
   for Srills LLC.

————

Before Shaw, Goodman, and Pologeorgis,
   Administrative Trademark Judges.

Opinion by Pologeorgis, Administrative Trademark Judge:

Srills LLC ("Respondent") is the owner of a registration on the Principal Register for the mark BULLY, in standard characters, as well as registrations for a number of other BULLY-formative marks (also in standard characters), all for various insecticides, pesticides, fungicides and herbicides for home and professional use, as identified below:

- BULLY for "Agricultural pesticides; Aquatic herbicides; Biological herbicides; Domestic pesticides; Herbicide for agricultural use; Herbicides, insecticides, pesticides and fungicides for home, garden and lawn use and for professional use; Insect exterminating agents; Insect repellent agents; Insect repellent in candle form; Insect repellent in the nature of a lamp oil; Insect repellent incense; Insect repellents; Preparations for repelling animals, birds and insects";[1]

- BED BUGS BULLY (BED BUGS disclaimed) for "Herbicides, insecticides, pesticides and fungicides for home, garden and lawn use and for professional use";[2]

- BUG BULLY (BUG disclaimed) for "Herbicides, insecticides, pesticides and fungicides for home, garden and lawn use and for professional use; Pesticides for agricultural use";[3]

- FRUIT FLY BULLY (FRUIT FLY disclaimed) for "Agricultural pesticides; Domestic pesticides; Herbicides, insecticides, pesticides and fungicides for home, garden and lawn use and for professional use";[4]

- FLEA BULLY (FLEA disclaimed) for "Herbicides, insecticides, pesticides and fungicides for home, garden and lawn use and for professional use";[5]

- SPIDER BULLY (SPIDER disclaimed) for "Agricultural pesticides; Domestic pesticides; Herbicides, insecticides, pesticides and fungicides for home, garden and lawn use and for professional use";[6] and

---

[1] Reg. No. 4804127, issued on September 1, 2015.

[2] Reg. No. 4821597, issued on September 29, 2015.

[3] Reg. No. 4821598, issued on September 29, 2015.

[4] Reg. No. 4821599, issued on September 29, 2015.

[5] Reg. No. 4821600, issued on September 29, 2015.

[6] Reg. No. 4821601, issued on September 29, 2015.

- BOX ELDER BULLY (BOX ELDER disclaimed) for "Agricultural pesticides; Herbicides, insecticides, pesticides and fungicides for home, garden and lawn use and for professional use."[7]

Optimal Chemical Inc. ("Petitioner") has petitioned to cancel each of the above-identified registrations on the ground of likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), based on Petitioner's alleged prior common law use of the marks BULLY, BED BUG BULLY, ROACH BULLY, SPIDER BULLY, FLEA BULLY, ANT BULLY, SILVERFISH BULLY, and TICK BULLY, all for pest-control products.

In its amended answer to the petition, Respondent denied most of the salient allegations;[8] but, Respondent admitted the allegations regarding the identification of goods recited in its subject registrations, as well as the filing dates and claimed dates of use set forth in the corresponding underlying applications of its subject registrations.[9]

Additionally, Respondent asserted two purported affirmative defenses: (1) the petition to cancel fails to state a claim upon which relief may be granted, and (2) Petitioner's claims are barred by the principles of unclean hands based on Petitioner's alleged violations of health and safety laws governing the

---

[7] Reg. No. 4840104, issued on October 27, 2015.

[8] 6 TTABVUE. Citations to the record or briefs in this opinion also include citations to the publicly available documents on TTABVUE, the Board's electronic docketing system. *See, e.g., Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473 (TTAB 2014). The number preceding "TTABVUE" corresponds to the docket entry number; the number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry.

[9] 6 TTABVUE 5.

labeling and sale of pesticides.[10] Insofar as Respondent neither filed a formal motion to dismiss for failure to state a claim during the interlocutory phase of this proceeding, nor argued this asserted affirmative defense in its brief, it is hereby deemed waived. *Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014). Likewise, since Respondent did not pursue its unclean hands affirmative defense based on alleged health and safety labeling violations at trial or argue the defense in its trial brief, this affirmative defense is also deemed waived.

Respondent, however, asserted in its trial brief for the first time a purported additional unpleaded "affirmative defense" of unclean hands based on allegations of spoliation and fabrication of evidence submitted by Petitioner.[11] Petitioner addressed this unpleaded "affirmative defense" on the merits in its reply trial brief.[12] As explained below, spoliation and fabrication typically do not fall under the penumbra of an unclean hands affirmative defense. Thus, we treat the spoliation and fabrication allegations as separate contested motions for sanctions, including entry of judgment, based on evidentiary issues. *SFM, LLC v. Corcamore, LLC*, 129 USPQ2d 1072, 1075 (TTAB 2018) (when alleged misconduct does not squarely fall within reach of the Federal Rules of Civil

---

[10] *Id.*

[11] Respondent's Trial Brief, pp. 30-31, 36 TTABVUE 31-32.

[12] Petitioner's Reply Trial Brief, pp. 19-20, 37 TTABVUE 21-22.

Procedure or Board rules, the Board may invoke its inherent authority to enter sanctions); *see generally Atl. Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771, 794 (D.C. Cir. 1984) ("We think the broad congressional power to authorize agencies to adjudicate 'public rights' necessarily carries with it power to authorize an agency to take such procedural actions as may be necessary to maintain the integrity of the agency's adjudicatory proceedings.") (citation omitted).

## I.    The Record

The record includes the pleadings and, pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files of each of Respondent's subject registrations. The record also comprises the evidence summarized below.[13]

---

[13] We note that some of the evidence proffered by both parties has been designated confidential and filed under seal. We have discussed only in general terms the relevant evidence submitted under seal. However, to the extent the parties have improperly designated testimony and evidence as confidential, the Board may disregard the confidential designation when appropriate. Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g) ("[t]he Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party."). *See also Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1461 (TTAB 2014).

We additionally note that both parties, by way of their respective notices of reliance, submitted printouts from various websites downloaded from the Internet. Although admissible for what they show on their face, *see* Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2), this evidence also contains hearsay that may not be relied upon for the truth of the matters asserted unless supported by testimony or other evidence. Fed. R. Evid. 801(c); *WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1038 (TTAB 2018); *Safer, Inc. v. OMS Invs., Inc.*, 94 USPQ2d 1031, 1039-40 (TTAB 2010); TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 704.08(b) (2019) ("The probative value of Internet documents is limited. They can be used to demonstrate what the documents show on their face. However, documents obtained through the Internet may not be used to demonstrate the truth of what has been printed.").

### A. Petitioner's Evidence

1. A notice of reliance on the following exhibits:[14]

- Testimony Declaration of Markus Skupeika, Petitioner's founder, owner, and President (Exhibit A);[15]

- Testimony Declaration of David Johnson, currently a regional manager for Quest Specialty Corporation (Exhibit B);[16]

- Testimony Declaration of Earl Blough, General Manager and Vice President of ConSeal International, Inc. (Exhibit C);[17]

- Invoices of sales of Petitioner's pesticides (Exhibits D-G);[18]

- Collection of screenshots of JPEG images of Petitioner's BULLY products, including the metadata of these images (Exhibit H);[19]

- Screenshot from the website www.mold-removal.biz purportedly dated October 2, 2006 offering for sale Petitioner's Bed Bug Bully, Roach Bully, Spider Bully, Flea Bully, Ant Bully, Silver Fish Bully, and Tick Bully pesticide products (Exhibit I);[20]

- Screenshots of the metadata for the images posted on Petitioner's website purportedly on October 2, 2006 demonstrating that the images were created in

---

[14] 18 TTABVUE.

[15] 18 TTABVUE 5-14. We note that Exhibits D-M submitted under Petitioner's notice of reliance are exhibits to the testimony declaration of Markus Skupeika filed as Exhibit A to the notice of reliance.

[16] 18 TTABVUE 15-20.

[17] 18 TTABVUE 21-24.

[18] 18 TTABVUE 25-30.

[19] 18 TTABVUE 131-35.

[20] 18 TTABVUE 136-37.

2005 and/or uploaded to the website in 2006 (Exhibit J);[21]

- Screenshot of the JPEG image of a promotion/advertisement of Petitioner's BED BUG BULLY product for Memorial Day 2005 on www.propertyperfections.net, wherein the metadata purportedly shows the image posted to the website was created on June 13, 2005 (Exhibit K);[22]

- Screenshots from Petitioner's website, www.propertyperfections.net and its e-commerce website offering Roach Bully and Bed Bug Bully for sale purportedly in 2005 (Exhibit L);[23]

- Copy of the executed Assignment of Petitioner's pleaded marks from Markus Skupeika to Petitioner (Exhibit M);[24] and

- Respondent's response to Petitioner's Interrogatory No. 2 regarding Respondent's first use in commerce of its subject marks (Exhibit N).[25]

2. Testimony deposition of Nick Ciske, a web developer employed at Cimbura.com Inc.;[26]

3. Testimony Deposition of Jeremy K. Rounsville, a corporate member of Respondent, Srills, LLC.[27]

4. Rebuttal notice of reliance on the following exhibits:[28]

---

[21] 18 TTABVUE 138-50.

[22] 18 TTABVUE 151-53.

[23] 18 TTABVUE 154-61.

[24] 18 TTABVUE 162-63.

[25] 18 TTABVUE 164-65.

[26] 23 TTABVUE.

[27] 24 TTABVUE.

[28] 29 and 30 TTABVUE. We note that Petitioner filed its rebuttal notice of reliance on the last day of its rebuttal testimony period, as last reset. The notice, however, did not

Cancellation No. 92063200

- Rebuttal Testimony Declaration of Markus Skupeika (Exhibit A);[29]

- Email communications between Petitioner and Petitioner's web hosting company regarding purported hacks of Petitioner's websites mold-removal.biz, propertyperfections.net and mycleaningproducts.com (Exhibit B);[30]

- Document produced by Respondent titled "Pest Control Product Review Box Elder B-Gone," which purportedly depicts a blog posting dated November 4, 2008 for Respondent's BOX ELDER B-GONE product (Exhibit C);[31] and

- Screenshot of a Wayback Machine search of Respondent's November 4, 2008 blog posting (Exhibit D).[32]

**B. Respondent's Evidence**

1. A notice of reliance on the following exhibits:[33]

---

include the accompanying exhibits. Petitioner filed the accompanying exhibits approximately one month after the close of Petitioner's rebuttal testimony period. The submission of the exhibits associated with Petitioner's rebuttal notice of reliance are therefore untimely. However, since Respondent did not object to the untimeliness of the submission of the exhibits, Respondent has waived the procedural objection of untimeliness. *See Genesco Inc. and Genesco Brands Inc. v. Martz*, 66 USPQ2d 1260, 1264 (TTAB 2003) (a party that fails to object to an untimely notice of reliance generally will result in a waiver of the objection). Accordingly, in our discretion, we have considered the exhibits in our determination herein.

[29] 30 TTABVUE 3-11. We note that Exhibits B-D of Petitioner's rebuttal notice of reliance identified below are exhibits to Markus Skupeika's rebuttal testimony declaration submitted as Exhibit A in the rebuttal notice of reliance.

[30] 30 TTABVUE 12-32.

[31] 30 TTABVUE 33-37.

[32] 30 TTABVUE 38-39.

[33] 21 (Confidential version) and 26 (Redacted version) TTABVUE. The designation of the exhibits, i.e., exhibit numbers, submitted by Respondent under its notice of reliance are identified differently in the notice of reliance itself as compared to the pages

- Domain name registration information for Petitioner's websites propertyperfections.com and mold-removal.biz obtained through a WHOIS search;[34]

- Petitioner's press releases obtained from the Internet and screenshots of Petitioner's websites;[35]

- Petitioner's responses to certain interrogatory requests propounded by Respondent;[36]

- Copy of portions of the declaration of Markus Skupeika submitted in support of Petitioner's motion for summary judgment; and[37]

- Petitioner's response in opposition to Respondent's motion to reopen discovery.[38]

2. Testimony Declaration of Kevin Ressler and accompanying exhibits;[39]

3. Testimony Declaration of Vic Winik and accompanying exhibits;[40]

4. Testimony Declaration of Respondent's expert witness, Nick Ciske, Chief Technology Officer of Cimbura.com and accompanying exhibits, including Mr. Ciske's expert report submitted in support of Respondent's opposition to Petitioner's motion for summary judgment;[41]

---

preceding the actual exhibits. This decision will only reference the exhibits by exhibit designation as set forth in the notice of reliance itself.

[34] 26 TTABVUE 137-44.

[35] 26 TTABVUE 13-60 and 93-136.

[36] 26 TTABVUE 61-92.

[37] 26 TTABVUE 83-85. The declaration submitted does not include Mr. Skupeika's signature (or a date). Accordingly, we have given no consideration to this evidence in our analysis.

[38] 26 TTABVUE 86-92.

[39] 22 TTABVUE.

[40] *Id.*

[41] *Id.*

5. Cross-Examination Testimony Deposition of Earl Blough;[42] and

6. Cross-Examination Testimony Deposition of Markus Skupeika.[43]

## II. Respondent's Claims of Fabrication and Spoliation of Evidence by Petitioner

In its brief, Respondent makes allegations pertaining to fabrication and spoliation of evidence by Petitioner during the course of this proceeding. Respondent's allegations were made in the context of what purports to be an "affirmative defense of unclean hands." In light of the serious nature of these allegations, we address them first.

We initially note that courts typically treat spoliation as an evidentiary matter, not as an affirmative defense. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155-156 (4th Cir. 1995) ("Under the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence. Even though application of the rule could prove to be critical to a party's recovery on a claim, it is not an affirmative defense, but a rule of evidence, to be administered at the discretion of the trial court. Consequently, a party need not indicate its intent to invoke the spoliation rule in the pleadings."); *BCOWW Holdings, LLC v. Collins*, SA 17-CA-379, 2017 WL 4082686, at *4 (W.D. Tex. Sept. 15, 2017) (citing *Vodusek*, 71 F.3d at 155-56);

---

[42] 31 TTABVUE.

[43] 32 (Redacted version) and 33 (Confidential version) TTABVUE.

*Travelers Prop. Cas. Co. of Am. v. All Seasons Roofing Inc.*, No. 4:15-CV-412, 2016 WL 8730570, at \*1 (E.D. Ark. Sept. 9, 2016) (holding that spoliation is not an affirmative defense but rather an evidentiary doctrine which can be used as a "spear" by seeking the sanction of dismissal (citing *Sherman v. Richem Co.*, 687 F.3d 996, 1006 (8th Cir. 2012)); *Donohoe v. Am. Isuzu Motors, Inc.*, 155 F.R.D. 515, 520 (M.D. Pa. 1994) (spoliation rule is not an affirmative defense preventing recovery, but only "leads to the exclusion of evidence or the admission of negative evidence"); *see also In re Lorillard Tobacco Co.*, 370 F.3d 982, 989, 70 USPQ2d 1865 (9th Cir. 2004) (denying ex parte seizure motion pursuant to Trademark Act Section 34(d), stating: "The district court has other vehicles available to address disappearing evidence, including sanctions for spoliation of evidence."). Accordingly, we construe Respondent's claim of spoliation as a motion for sanctions, particularly since Petitioner has addressed the spoliation claim on the merits in its reply trial brief.

As to fabrication of evidence, this also is usually treated as an evidentiary issue, not as an affirmative defense. *See Gilmer v. Colo. Inst. of Art*, 12 Fed. Appx. 892, 895, 2001 WL 686406 at \*3 (10th Cir. 2001) (court has the discretion to decide factual disputes regarding the fabrication of evidence even when that issue also goes to the merits of the case) (citing *Gonzalez v. Trinity Marine Grp., Inc.*, 117 F.3d 894, 898-99 (5th Cir. 1997) (affirming court's use of evidentiary hearing for motion to dismiss and sanctions in order to determine the validity of a claim of willful and bad faith fabrication of evidence and an abuse of the

judicial process)). We therefore also construe Respondent's purported "unclean hands defense" based on the alleged fabrication of evidence as a motion for sanctions predicated on litigation misconduct or fraud on the Board engaged in during the course of this proceeding.[44] Petitioner addressed the merits of Respondent's allegations of fabrication of evidence in its reply trial brief.

In order to prevail on either of its construed motions for sanctions predicated on spoliation or fabrication of evidence, Respondent must do so by clear and convincing evidence. *See, e.g.*, *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 98 USPQ2d 1693, 1706 (Fed. Cir. 2011) (spoliation must be established with clear and convincing evidence); *Gupta v. Walt Disney World Co.*, 482 F. App'x 458, 459 (11th Cir. 2012) ("[C]lear and convincing evidence of egregious conduct [is] required to establish fraud on the court."); *King v. First Am. Investigations, Inc.*, 287 F.3d 91, 95 (2d Cir. 2002) ("Fraud upon the court must be established by clear and convincing evidence."); *Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985) (the party alleging fraud on the court bears a heavy burden to prove the fraud by clear and convincing evidence); *Landmark Legal*

---

[44] We have in the past allowed a plaintiff to amend a pleading to assert a claim of fraud on the Board based upon the fabrication of evidence in a proceeding before us. In *Doctor Vinyl & Associates v. Repair-It-Industries, Inc.*, 220 USPQ 639 (TTAB 1983), we found that defendant presented false documents showing its priority during trial, that "applicant's conduct constitutes an attempted fraud on the Patent and Trademark Office and unclean hands in this proceeding" and sustained the opposition on that basis. But as these district court decisions make clear, amendment of pleadings is not required for a tribunal to have the power to address fabrication of evidence in a proceeding before it.

*Found. v. Envtl. Prot. Agency*, 82 F. Supp. 3d 211 (D.D.C. 2015) (spoliation must be demonstrated by clear and convincing evidence).

## A. Spoliation of Evidence – Exhibits H and I of Petitioner's notice of reliance

We first turn to Respondent's spoliation of evidence claim. Spoliation refers to "the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *see also Micron Tech.*, 98 USPQ2d at 1700. Generally, where a party seeks sanctions based on the spoliation of evidence, it must establish:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Moody v. CSX Transp., Inc.*, 217 F. Supp. 3d 410, 424-25 (W.D.N.Y. 2017) (citation omitted) (collecting cases). This general rule applied to the destruction of both tangible and electronic evidence until December 1, 2015, at which time Fed. R. Civ. P. 37 was amended to provide a different standard for destruction of electronically stored information ("ESI"). Specifically, Fed. R. Civ. P. 37(e) now provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).[45] This amended section advises that four threshold requirements must be satisfied before a tribunal decides whether spoliation sanctions are appropriate: (1) the ESI should have been preserved; (2) the ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery. Fed. R. Civ. P. 37(e); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 104 (E.D. Va. 2018).

Respondent maintains that Petitioner has failed to preserve vital business records and requests that the Board consider all available remedies in response to Petitioner's actions. Specifically, with regard to Exhibits H & I submitted under Petitioner's notice of reliance, namely, (1) a collection of screenshots of JPEG images of Petitioner's BULLY products, including the metadata of these images (Exhibit H), and (2) screenshot from the website www.mold-removal.biz

---

[45] Inasmuch as this proceeding commenced after December 1, 2015, amended Fed. R. Civ. P. 37 is applicable to this case.

purportedly dated October 2, 2006, offering for sale Petitioner's Bed Bug Bully, Roach Bully, Spider Bully, Flea Bully, Ant Bully, Silver Fish Bully, and Tick Bully pesticide products (Exhibit I), Respondent maintains that the identified webpages were removed from the Internet just prior to the filing of Petitioner's summary judgment motion.[46] Respondent contends that the removal of these pages from the Internet was confirmed by both Respondent's counsel and through the testimony of Respondent's expert, Mr. Ciske.[47] As a result, Respondent argues that it could not examine these webpages for their authenticity. Respondent's expert, Mr. Ciske, also observed the inclusion of coding within the website's architecture that appears to be intended to cause the removal of information from the Internet Archives Project.[48]

In response, Petitioner explains that, due to ongoing hacks, the website www.mold-removal.biz has not been functioning properly for more than a year, including issues with subpages automatically redirecting to the website's homepage.[49] Petitioner further maintains that this is not a new issue identified over the past few weeks, as Respondent claims.[50] More importantly, Petitioner contends that no information from its website has been deleted, and that although subpages of the website are not currently accessible, the homepage

---

[46] Respondent's Trial Brief, p. 30, 36 TTABVUE 31.

[47] *Id.*

[48] Ciske Decl., 22 TTABVUE 26.

[49] Petitioner's Reply Trial Brief, p. 19, 37 TTABVUE 21.

[50] *Id.*

can still be accessed, as can the page from which Respondent and Mr. Ciske have purportedly examined the product file images (http://mold-removal.biz/wpcontent/uploads).[51] Petitioner concedes that Mr. Ciske's claim that Petitioner intended to cause the removal of information from the Internet Archives Project is accurate.[52] However, in order to rebut Mr. Ciske's accusation of culpable intent and in response to certain admission requests, Petitioner admits that, in or around 2007, it excluded portions of its website from recordation and archival (and thus, those portions would likely not have been captured by archiving websites such as the Wayback Machine) by placing a robots.txt file on the webpage in order to prevent or minimize security risks to the website.[53] Petitioner further maintains that several of its websites, including mold-removal.biz, have been hacked on several occasions, which is evidenced, in part, by the communications between Petitioner and Stable Host, Petitioner's web hosting company.[54] Thus, Petitioner argues that no spoliation has occurred, and Respondent's "telling attempt" to fabricate such accusations should be rejected.

The testimony of Respondent's expert, Mr. Ciske, however, indicates otherwise. Mr. Ciske specifically stated the following in his expert report:[55]

---

[51] Petitioner's Reply Trial Brief, p. 20, 37 TTABVUE 22.

[52] 22 TTABVUE 26.

[53] 30 TTABVUE 7 ¶¶ 17-19.

[54] 30 TTABVUE 7 ¶ 18.

[55] 22 TTABVUE 26.

I ran a search for "site:mold-removal.biz" in Google on 1/10/2017. This shows the pages in Google's index for a given domain. At the time of my search, Google ha[d] no record of the pages in Exhibit I in its index which, in my professional opinion, means that it is highly unlikely they have existed since 2005/2006, unless they were intentionally hidden from Google by a robots.txt file or a noindex tag, which would be counterproductive to a page advertising a product for sale. I found no indication these files had been excluded from being indexed by Google in the robots.txt file.

What I did find was this in the robots.txt file:
http://mold-removal.biz/robots.txt

Disallow User-Agent: ia_archiver
Disallow: /cgi-bin/

The Disallow User-Agent: ia_archiver line is an attempt to block the Internet Archive (Wayback Machine) robot from archiving web pages and images on the site and instructs it to remove previous archives – which I'd expect to see on a site attempting to pass off new posts as old ones by seeking to remove the site history from the Internet Archive – essentially getting rid [of] the evidence.

Petitioner filed its summary judgment motion on December 15, 2016.[56] As an exhibit to the motion, Petitioner included a screenshot of the same webpage at issue, i.e., Exhibit I of Petitioner's notice of reliance. Clearly, this portion of Petitioner's mold removal.biz website was accessible shortly before Petitioner filed its summary judgment motion since it submitted the webpage with its motion, notwithstanding that Petitioner admitted to including a robots.txt file on the website which precluded the capturing of certain segments of the website. However, by the time Respondent's response to the motion for summary judgment was due, Exhibit I was no longer accessible. From this fact,

---

[56] 8 TTABVUE.

corroborated by the testimony of Respondent's expert, Mr. Ciske, the Board concludes that Petitioner blocked access to this particular webpage.

With regard to the four threshold requirements under Rule 37(e), there is no doubt that Petitioner had control over this evidence and had an obligation to preserve it, particularly since Petitioner itself was relying upon this evidence in support of its motion, meeting the first threshold requirement. Moreover, contrary to Petitioner's assertion, we see no difference between destroying or losing evidence and blocking accessibility to – essentially hiding – evidence, particularly in the nature of specific webpages on a party's website. *See e.g.*, *OmniGen Research, LLC v. Wang*, 321 F.R.D. 367, 371 (D. Or. 2017) ( "Default Judgment and terminating sanctions for the spoliation of evidence is warranted in instances wherein a party has intentionally hidden or destroyed evidence to the extent it severely undermines the Court's ability to render a judgment based on the evidence and threatens the 'orderly administration of justice'".) (citation omitted). We therefore find that Petitioner precluded access to this evidence, and deprived Respondent, to its prejudice, of the use of the information subject to this evidence. Fed. R. Civ. P. 37(e)(1). Accordingly, we find that the ESI was lost due to Petitioner's failure to take reasonable steps to preserve it, meeting the second and third threshold requirements. As to the fourth requirement, we further find that the information stored on the subject webpages, including any metadata associated with the webpages, could not be restored or replaced through additional discovery. Accordingly, we find that

blocking access to this portion of Petitioner's mold-removal.biz website is a form of spoliation of evidence. Thus, we grant Respondent's construed motion for sanctions for spoliation of evidence solely under Fed. R. Civ. P. 37(e)(1)[57] and only to the extent that we have given no consideration to Exhibits H and I regarding Petitioner's claim of likelihood of confusion.[58]

## B. Fabrication of Evidence

We next turn to Respondent's construed motion for sanctions predicated on litigation misconduct or fraud on the Board based on allegations of fabrication of evidence.

Many courts have found the fabrication of evidence to be an abusive litigation practice, or even a type of fraud on the court. *See, e.g., Oliver v. Gramley*, 200 F.3d 465, 466 (7th Cir. 1999); *Gonzalez*, 117 F.3d at 898-99; *Pope v. Fed. Express Corp.*, 974 F.2d 982, 984 (8th Cir. 1992); *Aoude v. Mobil Oil*

---

[57] We acknowledge that Respondent requested dismissal of the petition to cancel, in part, due to spoliation of evidence. *See* Respondent's Brief p. 30, 36 TTABVUE 31. However, dismissal due to spoliation (as opposed to lesser sanctions) is appropriate only where there is clear and convincing evidence of, *inter alia*, bad faith. *See, e.g., Micron Tech.*, 98 USPQ2d at 1706. We find, based on the record, that Respondent has failed to establish by clear and convincing evidence that Petitioner acted with the intent to deprive Respondent of the information contained in Exhibits H and I (including any associated metadata), as required under Fed. R. Civ. P. 37(e)(2). Accordingly, dismissal under Fed. R. Civ. P. 37(e)(2) is not warranted under the particular circumstances of this case. *See generally* Fed. R. Civ. P. 37(e) Advisory Committee notes (2015 amendment).

[58] The fact that we are excluding consideration of Exhibits H and I from our analysis of Petitioner's likelihood of confusion claim based on our finding of spoliation does not preclude us from determining whether Exhibit I was also fabricated, as discussed more fully below.

*Corp.*, 892 F.2d 1115, 1118-19 (1st Cir. 1989); *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 916-17 (9th Cir. 1987).

Fraud upon the court is "typically confined to the most egregious cases … in which the integrity of the court and its ability to function impartially is directly impinged." *Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp.*, 12 F.3d 1080, 29 USPQ2d 1283, 1287 (Fed. Cir. 1993) (quoting *Great Coastal Express, Inc. v. Int'l Bhd. of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982)). *See also Aoude*, 892 F.2d at 1118 (fraud on the court occurs where "a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by … unfairly hampering the presentation of the opposing party's claim or defense."); *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988) ("'[F]raud upon the court' is limited to fraud which seriously affects the integrity of the normal process of adjudication").

If a party is found to have manufactured evidence by fabrication or alteration of preexisting evidence, or to have intentionally provided false testimony in a deposition or at trial, dismissal of that party's claims or defenses can be the proper sanction as an exercise of the Board's inherent authority to protect the integrity of the judicial process. *Cf. Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (describing a federal court's inherent powers to address litigation misconduct that undermines the judicial process, including the power to dismiss the proceeding before it).

"[C]ourts are free to sanction bad faith conduct that arises during the course of litigation. These 'inherent powers' to punish bad faith conduct during litigation are 'necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 60 USPQ2d 1705, 1710-1711 (Fed. Cir. 2001) (quoting *Chambers*, 501 U.S. at 44). "'[T]he power to punish for contempts is inherent in all courts.'" *Chambers*, 501 U.S. at 44 (quoting *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1874)). Although a particularly severe sanction, outright dismissal of a proceeding is within our discretion. *Chambers*, 501 U.S. at 45 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980)).[59] When dismissing a case for fraudulent litigation conduct, the court does so not only as a remedy for harm incurred by other parties, but also as a deterrent to future litigants who might consider engaging in similar conduct. *See, e.g.*, *Jimenez v. Madison Area Tech. Coll.*, 321 F.3d 652, 657 (7th Cir. 2003) (citing deterrence rationale for affirming dismissal in Fed. R. Civ. P. 11 context); *Aoude*, 892 F.2d at 1118 (holding that courts should consider the "deterr[ence of] future misconduct" when determining appropriate sanction).[60]

---

[59] We recognize that a more graduated approach to sanctions is encouraged in most circumstances. *See, e.g.*, *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995) ("[D]ismissal is a drastic step, normally to be taken only after unfruitful resort to lesser sanctions." (internal quotation marks omitted)). But for reasons cogently explained by other courts, as discussed later in this opinion, this type of fraud on the Board uniquely calls for the sanction of dismissal.

[60] Terminating sanctions are appropriate where the misconduct relates to a material matter before the court. *See, e.g.*, *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) ("[T]hus, when a party lies to the court and his

Respondent calls into question or maintains that Petitioner fabricated the following evidence of record:

1. **Exhibit F of Petitioner's notice of reliance.**

Exhibit F, submitted under Petitioner's notice of reliance, comprises a number of invoices purportedly from Penek Chemical to Property Perfections related to the manufacturing of Bully-branded products from June 2005 until January 2006. Pursuant to his testimony declaration, Mr. Skupeika, Petitioner's owner, declared that these invoices "were generated for the purposes of [this] litigation from Quickbooks data in my computer, which computer had been purchased from Penek Chemical. To generate these invoices, I accessed the data from the Quickbooks database and sent it to print in invoice format."[61]

During his cross-examination, however, Mr. Skupeika could not identify from which exact computer he retrieved the data to generate the Penek Chemical invoices, i.e., whether it was a computer Petitioner acquired from the asset purchase of Penek Chemical or another computer from his company. Initially, Mr. Skupeika testified that the Penek invoices were "generated from the same computer which was acquired from [the] Penek Chemicals purchase,

---

adversary intentionally, repeatedly, and about issues that are central to the truth-finding process, it can fairly be said that he has forfeited his right to have his claim decided on the merits.").

[61] Skupeika Testimony Decl., ¶ 22, 18 TTABVUE 10.

the asset purchase."[62] He then testified that because the computers acquired from Penek Chemical "had issues, there's a chance that it could be from a different computer or the same computer. I'm not sure exactly."[63] He also testified that "[i]n order to produce these documents, they had to be on some sort of device. I don't know or recall the exact specifics of which device that was, but I wanted to make sure -- I wanted to make sure I generated all the invoices we could and show all the data we could that we had first used since 2005."[64] Mr. Skupeika also testified that the computers acquired from Penek are not operational.[65]

Respondent points to the undisputed testimony of Mr. Vic Winik and Mr. Kevin Ressler, owners and associates of Penek Chemical, to refute Petitioner's claim that Penek Chemical was ever involved with the manufacturing of Bully-branded products or any form of a pesticide product. Specifically, Mr. Ressler testified as follows:[66]

> I have reviewed the attached invoices (Exhibit 1)[67] which I understand were provided by Mr. Skupeika of Optimal Chemical, Inc., in relation to a trademark cancellation action before the USPTO and which identify Penek Chemical as the seller of the goods being sold. I am unaware of any circumstance that would result in these invoices being created.

---

[62] Cross-Examination of Skupeika, 73:10-12; 32 TTABVUE 79.

[63] *Id*. at 73:15-19; 32 TTABVUE 79.

[64] *Id*. at 79:21-25, 80:2-4; 32 TTABVUE 86-87.

[65] *Id*. at 75:5-7; 32 TTABVUE 81.

[66] Ressler Testimony Decl., ¶¶ 2-5, 22 TTABVUE 4-5.

[67] Exhibit 1 is comprised of the invoices submitted as Exhibit F under Petitioner's notice of reliance.

Penek Chemicals began operations in September 2006, and did not exist in 2005.

At no point during my ownership and operation of Penek did Penek produce or sell the type of material indicated on the documents to Property Perfections, Dream Ware Enterprise,[68] Marcus Skupeika or anyone else for that matter. We specifically provided cleaning and sealing products for natural stone, tile and other hard surfaces.

On or about June 27 of 2016 I was contacted by Mr. Marcus Skupeika via telephone. During my call with Mr. Skupeika, Mr. Skupeika informed me that an attorney would be contacting me. An attorney will be contacting you about this bed bug bully product that you were making for me. I said we never made that product and Marcus said just tell them you did, it's no big deal.

Mr. Winik testified as follows:[69]

Sometime after the passing of Bob Novak (before 2005 I believe), I became part owner of his company Compliance Specialists Inc (which we renamed Compliance Specialist International). This company mainly operated from a location on Powerline Road, in Pompano Beach Florida. This company is now closed.

When the assets of Kevin Ressler's company Penek Chemicals were sold to Marcus Skupeika I personally worked directly for Marcus for several months assisting with the manufacturing of products.

I do not recall ever manufacturing any products using BULLY as a part of its branding while working for Compliance Specialist, Compliance Specialists International, or Markus Skupeika. I also do not recall manufacturing any type of pesticide for Marcus Skupeika.

---

[68] Petitioner's CEO, Mr. Skupeika, testified that Dream Ware Enterprises is a company owned by Mr. Skupeika that focuses on marketing and building brands and businesses. *See* Skupeika Cross-Examination Test., 7:21-23; 32 TTABVUE 13.

[69] Winik Testimony Decl., ¶¶ 2-4, 22 TTABVUE 8-9.

Petitioner did not cross-examine either Mr. Ressler or Mr. Winik. Instead, Petitioner submitted the rebuttal testimony declaration of Petitioner's owner, Mr. Skupeika. With regard to Mr. Winik's testimony, Mr. Skupeika testified as follows:[70]

> Vic Winik served as an independent contractor for [Petitioner] for a very short period of time, before substantial issues were uncovered concerning Mr. Winik's past and his activities while working for [Petitioner] (including material representations to [Petitioner] regarding his qualifications), at which time he was fired. As a limited example, Mr. Winik presented himself as a chemist, but it was quickly uncovered that he was not. Thus, it is understandable that Mr. Winik does not recall manufacturing the Bully Products while working for me because he was not permitted to participate in the manufacturing of any [of Petitioner's] product [sic], let alone the Bully products.

With regard to Mr. Ressler's testimony, Mr. Skupeika testified as follows:[71]

> I do not recall contacting Mr. Ressler during the pendency of this case, but I certainly would never have made the statement referenced in Paragraph 5, wherein Mr. Ressler accuses me of telling Mr. Ressler to lie about manufacturing Bully Products.
>
> In fact, Mr. Ressler and I have not been on comfortable speaking terms since we had verbal disputes regarding Mr. Ressler's stated beliefs concerning how I should run my business after I purchased his company. Although all the details are not relevant to (or appropriate for) this proceeding, based on our contentious history, it is not surprising that he would fabricate such a statement.

Petitioner does not dispute Mr. Ressler's testimony that Penek Chemicals was not in operation in 2005 and that it only began operations in September

---

[70] Skupeika Rebuttal Testimony Decl., ¶ 23, 30 TTABVUE 9.

[71] *Id*. at ¶¶ 25-26; 30 TTABVUE 9.

2006. Petitioner also does not dispute Mr. Ressler's testimony that Penek Chemicals did not manufacture or sell pesticide products. Yet, Petitioner introduced, as Exhibit F, purported invoices from Penek Chemicals to Petitioner for BULLY-branded pesticide products that are dated between June 2005 and January 2006.

Further, even if Mr. Winik was not a chemist, that does not necessarily undermine the truthfulness of Mr. Winik's testimony that he does not recall Petitioner ever manufacturing pesticides under the BULLY marks during his employment with Petitioner. Even if Mr. Winik was not intimately involved with the actual manufacturing process of Petitioner's BULLY pesticides, clearly, as Petitioner's employee, he would likely have knowledge of whether or not Petitioner was in the business of manufacturing such goods under the BULLY marks. Indeed, it would be reasonable to conclude that employees of a particular company would usually possess the general knowledge of the goods or services offered by that company.

Based upon (1) Mr. Ressler's uncontroverted testimony that Penek Chemicals only began operations in September 2006, did not exist in 2005, and never produced pesticides, (2) Mr. Skupeika's inconsistent and vague testimony regarding the source of the information used to generate the Penek invoices, and (3) the fact that the invoices submitted were neither originals nor created by Penek Chemicals, the seller of the alleged pesticides to Petitioner, we conclude that the Penek Chemicals invoices were fabricated by Petitioner.

We also find extremely troubling the testimony of Mr. Ressler regarding the request by Mr. Skupeika for Mr. Ressler to lie about manufacturing pesticides for Petitioner. Mr. Ressler's position concerning the authenticity of the Penek invoices, as well as Mr. Skupeika's conversation with him, were made known to Petitioner at the end of October 2016.[72] Petitioner was advised of this position, as well as statements from Mr. Ressler that he had been directly contacted several months before by Mr. Skupeika.

Although Petitioner was put on notice of this alleged conversation, instead of cross-examining Mr. Ressler, Petitioner submitted an affidavit denying that the conversation ever took place. We acknowledge that Mr. Skupeika has testified that he does not recall contacting Mr. Ressler during this proceeding, but that if he did, he did not request that Mr. Ressler lie about manufacturing BULLY-branded pesticides for Petitioner. We do not find Mr. Skupeika's testimony credible, particularly since Petitioner does not dispute Mr. Ressler's testimony that Penek Chemicals began operations in September 2006, did not exist in 2005, and never produced pesticides.

2. **Exhibit K of Petitioner's notice of reliance.**

Exhibit K submitted under Petitioner's notice of reliance consists of an advertisement for, among other things, its BED BULLY-branded pesticide and corresponding JPEG metadata regarding the creation date of the advertisement. Petitioner states in its notice of reliance that Exhibit K consists

---

[72] Respondent's Trial Brief, p. 29 fn. 2, 36 TTABVUE 30.

of "[s]creenshots of the metadata of image files of a promotion for Memorial Day on www.propertyperfections.net, wherein the metadata shows the image posted on the website was created on June 13, 2005, which supports Petitioner's priority of use of the Bully marks."[73] Both are displayed below:



---

[73] Petitioner's notice of reliance p. 2; 18 TTABVUE 3, 151-53.



Respondent argues that this exhibit purports to be an online advertisement for a Memorial Day sale ending on June 30, 2005, yet according to evidence submitted by Respondent, Petitioner's website domain name www.propertyperfections.net was not registered until January 30, 2006.[74] In response, Petitioner contends that the company Property Perfections was formed in 2004 and that the image was used on physical marketing materials, prior to being uploaded to the website.[75]

Petitioner does not identify with specificity what it means by "image," i.e., whether it means the image of the particular products displayed in the

---

[74] 26 TTABVUE 138-40.

[75] Petitioner's Reply Brief, p. 12 n.7; 37 TTABVUE 14.

advertisement or the advertisement as a whole. If the latter, then Petitioner's argument is suspect because the advertisement clearly advises consumers to either "click" or call the number provided to place an order for the products displayed in the advertisement. If the image was first used on physical marketing media before Petitioner's domain name propertyperfections.net was registered in January 2006, and the advertisement is for a Memorial Day sale ending on June 30, 2005, a consumer could not "click" to order any of the products shown in the advertisement. We find it implausible that Petitioner would create an advertisement for use in physical media, before the existence of its website, urging customers to "click" on the advertisement. The advertisement also does not state that the website will become operational at some date in the future.

If Petitioner meant that the term "image" related solely to images of the products displayed in the advertisement, Petitioner did not submit copies of its "physical marketing materials" into the record to substantiate its claim that the image appeared on these materials prior to posting on its website. Further, Petitioner's owner, Mr. Skupeika, testified that Exhibit K "comprises screenshots of image files of a promotion for Memorial Day 2005 on www.propertyperfections.net, wherein the metadata shows the image posted to the website was created on June 13, 2005, which supports Petitioner's priority of use of the Bully marks."[76]

---

[76] Skupeika Decl., ¶ 27, 18 TTABVUE 11-12.

The advertisement, however, purports to be a Memorial Day sale in 2005 but the JPEG meta tag states that it was created in mid-June 2005. This is well after Memorial Day 2005, which, as it does every year, fell in May. Most telling, however, is that Respondent's expert, Mr. Ciske, stated in his expert report that although the metadata displayed in Exhibit K indicates that the JPEG image was created on June 13, 2005, the image was in fact created much later. This is evidenced by the true metadata within the JPEG file showing it could not have been created in the time period specified by Petitioner because the software used to create the JPEG image, namely Adobe Creative Suite 4, was released in October 2008 – 3 years after the image was claimed to have been created.[77]

Mr. Ciske also opined that the software that was used to create these images was released three years after the claimed date of their creation and "strongly implies that the file system timestamps were intentionally altered by the [Petitioner], as there is no other way I know of to 'create' files in 2005/2006, using software released in 2008, with XMP meta data claiming a creation date of 2014 … other than owning a time machine."[78] Although Petitioner submitted

---

[77] Ciske Decl., 22 TTABVUE 25. Mr. Ciske's expert report was originally submitted as an exhibit to Respondent's response to Petitioner's motion for summary judgment in this matter. Respondent re-submitted the report during its testimony period with a declaration from Mr. Ciske affirming the accuracy of the information contained in the report in its entirety. We further note that Mr. Ciske refers to Exhibit K as Exhibit J in his report since that is how Petitioner identified the exhibit in its motion for summary judgment.

[78] *Id.*

the testimony declaration of Mr. Ciske,[79] this testimony does not contradict or undermine Mr. Ciske's statements made in his expert report that the Adobe software program used to create the images comprising Exhibit K only became available three years after Petitioner's alleged creation date of such images.[80] In view of the foregoing, we find that Exhibit K is a fabricated or altered document.

3. **Exhibits I and J of Petitioner's notice of reliance.**

Exhibits I and J were submitted by Petitioner under its notice of reliance to support Petitioner's alleged priority of use of its pleaded BULLY marks. As identified by Petitioner, (1) Exhibit I is a "screenshot of [an] October 2, 2006 website posting of 'mold-removal.biz' offering for sale Bed Bug Bully, Roach Bully, Spider Bully, Flea Bully, Ant Bully, Silver Fish Bully, and Tick Bully," and (2) Exhibit J is comprised of "Screenshots of the metadata for the images posted in the October 2, 2006 posting, demonstrating that the images were created in 2005 and/or uploaded to the website in 2006."

Respondent argues that Petitioner's Exhibits I and J contain a number of questionable claims, that when viewed in their entirety, demonstrate a high likelihood that the exhibits were fabricated.[81] Specifically, Respondent refers to the expert report of Mr. Ciske, who, after reviewing the source code for the blog

---

[79] 23 TTABVUE.

[80] We additionally note that Petitioner did not submit its own expert report to rebut any of the opinions or conclusions made by Mr. Ciske.

[81] Respondent's Brief, p. 13; 36 TTABVUE 14.

posts represented in Petitioner's Exhibits I and J, opines that there is significant evidence to demonstrate that these webpages were not posted to the website www.mold-removal.biz on the dates listed on the documents, namely, in the 2005/2006 timeframe, but rather at a much later time.[82]

Specifically, Mr. Ciske determined that the image files indicate that the images were created much later, in 2014. This is evidenced by true metadata within those files. Mr. Ciske also determined that the images were most likely uploaded to Petitioner's www.mold-removal.biz website in 2016 because the upload folders for the website indicate that between 2006 and 2016, there were only mold-related product uploads and nothing pertaining to pest control or "Bully" products.[83] We find Mr. Ciske's testimony credible, particularly because Petitioner did not submit any evidence to contradict or undermine Mr. Ciske's opinions and conclusions. As such, we find that the evidence shows clearly and convincingly that the creation dates of the images in Exhibits I and J were fabricated or altered.

4. **Exhibit L of Petitioner's notice of reliance**.

As testified by Petitioner's owner, Mr. Skupeika, Petitioner's Exhibit L submitted under its notice of reliance consists of a "collection of screenshots from Propertyperfections.net and its e-commerce website offering Roach Bully

---

[82] Ciske Decl., 22 TTABVUE 14-19.

[83] *Id*.

and Bed Bug Bully for sale in 2005, which supports Petitioner's priority of use of the Bully marks."[84] Some of the screenshots are displayed below:



---

[84] Skupeika Testimony Decl., ¶ 28, 18 TTABVUE 12.

**Product Image On 2005 Site 1 Gallon:**



**Product Image of 5 Gallon On 2005 Site:**



Respondent contests the veracity of Mr. Skupeika's testimony that the screenshots submitted under Exhibit L demonstrate use of Petitioner's pleaded BULLY marks in 2005 because Petitioner's website www.propertyperfections.com was not created until January 2006.[85] For the same reason, Respondent also disputes the truthfulness of the annotations above the screenshots that state that the particular BULLY product displayed in the screenshot was available on Petitioner's website in 2005.[86]

In response, Petitioner concedes that the images are not from 2005, but rather as correctly stated in Petitioner's notice of reliance, were taken for the purposes of this proceeding on or around November 12, 2015, and thus reflect the cited images and websites as of that date – not 2005.[87] Petitioner further contends that, although it regrets this mistake, had Respondent asked Mr. Skupeika about these images during his cross-examination testimony deposition, he would have clarified this issue at that time. Respondent chose not to ask about this "obvious scriveners error" and, instead, has sought to use it here in a "gotcha" manner.[88]

Petitioner's argument is unconvincing. While Petitioner contends that the images submitted under its notice of reliance were captured on or about November 12, 2015, the notice of reliance specifically states that Exhibit L "is

---

[85] Respondent's Trial Brief, p. 17, 36 TTABVUE 18.

[86] *Id.* at p. 18, 36 TTABVUE 19.

[87] Petitioner's Reply Brief, p. 13, 37 TTABVUE 15.

[88] *Id.* at pp. 13-14, 37 TTABVUE 15-16.

a collection of screenshots from Propertyperfections.net and its e-commerce website offering Roach Bully and Bed Bug Bully **for sale in 2005**, which supports Petitioner's priority of use of the Bully marks." (emphasis added). Accordingly, the testimony of Mr. Skupeika is untruthful to the extent that that website www.propertyperfections was not in operation in 2005. Similarly, the annotations at the top of the screenshots indicating that the displayed BULLY good were pictured on Petitioner's website in 2005 also is, under the circumstances, a false statement. Moreover, Petitioner's argument that it was Respondent's burden to verify the accuracy of the dates of use of these screenshots is unavailing. It is a party's affirmative duty and obligation under Fed. R. Civ. P. 11 to submit testimony and evidence that is accurate and truthful and not submitted for any improper purpose.[89] *See* Fed. R. Civ. P. 11(b)(2).

5. **Petitioner's Press Releases, YouTube video and websites for its BULLY pesticides.**

In further support of its assertions that Petitioner's evidence purportedly showing that it began using its BULLY marks in association with its pesticide products in 2005/2006 are based on fabricated evidence, Respondent submitted various press releases from Petitioner indicating the launch of Petitioner's

---

[89] To be clear, we do not consider Respondent's construed motion for sanctions based on fabrication of evidence as one brought under Fed. R. Civ. P. 11. We only reference Fed. R. Civ. P. 11 for the purpose of identifying a party's obligations under the rule in Board proceedings.

BULLY pesticide products, as well as a YouTube video and screenshots from Petitioner's websites mold-removal.biz, propertyperfections.net and bedbugbully.com.[90] Respondent contends this evidence contradicts and calls into question Petitioner's testimony and supporting documents that it began using its BULLY pesticides in 2005/2006. Excerpts from the press releases are set forth below:[91]

- A press release dated **June 27, 2009,** states "MyCleaningProducts.com **today introduced** Bed Bug Bully **a new** safe Bed Bug Killer, its new bio-pesticide aimed at the growing bed bug problem."[92]

- A press release dated **June 29, 2009,** states "**[a] new natural cleaning product manufacturer** have [sic] sifted through 8 months of work **to develop a new solution** that kills **bed bugs** without using harmful chemicals." The press release also states that "Markus [Skupeika] stated, 'The fact that our science team has already developed natural aroma-like fragrances in our Green Bean line made it very easy for [our] chemistry team to add this must have element into a very stressful experience, plus I know from first hand experience the last thing one wants is your home to smell like a pesticide plant." The press release concludes "Bed Bug Bully

---

[90] Respondent's notice of reliance, 21 TTABVUE. We note Respondent did not submit any testimony regarding the truth of the matters asserted in this evidence. As such, this evidence would generally only be considered for what it shows on its face. *See WeaponX Performance Prods.*, 126 USPQ2d at 1038; *Safer*, 94 USPQ2d at 1039-40; *see also* fn. 13, supra. However, since Petitioner opined on the accuracy of the information contained in this evidence in its rebuttal testimony and rebuttal trial brief, *see* Skupeika Rebuttal Testimony, ¶¶ 2-14, 30 TTABVUE 4-6 and Petitioner's Reply Trial Brief pp. 11-20, 37 TTABVUE 13-22, and did not expressly object to the admissibility of this evidence on any grounds, we find that Petitioner has waived any objections regarding the same. Accordingly, we have considered this evidence for the truth of the matters asserted therein.

[91] The bolded text is emphasis added by the Board.

[92] Respondent's notice of reliance, Exh. PR007, 26 TTABVUE 124-27.

(bedbugbully.com) is being offered with a 100% guarantee and also a free sample **during the new product launch**."[93]

- A press release dated **November 3, 2009,** states that "[i]f you are having problems with killing bed bugs, then you will be pleasantly surprised about Bed Bug Bully **a new bed bug product** which right now, **during the special launch**… you can receive the free trial."[94]

- A press release dated **May 21, 2012,** states that "Green online company MyCleaningProducts.com **added a new cleaner to its line of products**. It **released Silverfish Bully**, a pesticide-exempt solution, that could treat silverfish infestation safely and effectively."[95]

- A press release dated **July 21, 2012,** which states: "MyCleaningProducts **introduced a new spider repellant. Named as Spider Bully**, the spider spray promises an effective and safe pest-control treatment."[96]

- A press release dated **August 17, 2012,** states "MyCleaningProducts is reinventing spider repellant as an organic solution. The company **recently introduced** its spider spray called **Spider Bully** that promises an effective and safe way to get rid of the arachnids."[97]

- A press release dated **April 29, 2013,** states "My Cleaning Products released a new guide of how to kill fleas and prevent their comeback. Along with it, the company **launched its non-pesticide flea spray Flea Bully**." "Moreover, MCP detailed that pest-control companies and hotels have already been using Flea Bully for years."[98]

---

[93] *Id*. at Exh. PR005, 26 TTABVUE 114-16.

[94] *Id*. at Exh. PR007, 26 TTABVUE 121-123. Respondent identified this exhibit, as well as the exhibit referenced in n.69, supra, as Exh. PR007.

[95] *Id*. at Exh. PR001, 26 TTABVUE 98-101.

[96] *Id*. at Exh. PR008, 26 TTABVUE 128-31.

[97] *Id*. at Exh. PR006, 26 TTABVUE 117-20.

[98] *Id*. at Exh. PR001, 26 TTABVUE 93-97.

- A press release dated **June 26, 2013,** titled "**New Spider Spray Launched, My Cleaning Products Announces It's Giving It Out With 10% Discount**" states: "**A new spider spray called Spider Bully was launched by My Cleaning Products**. The company stated that it is an organic-based spray for spiders that works excellent as spider killer and repellent and is currently available with 10% off."[99]

- A press release dated **August 2, 2013,** titled My Cleaning Products Brings Out Organic Ant Repellent Product and which states: My Cleaning Products **launched its organic-based ant repellent spray**. The solution gets rid of ants effectively while providing a long-lasting protection against the pests, it explained" and "...anyone looking for a truly reliable ant repellent without having to worry about dangerous chemicals should pick it [**Ant Bully**] over others. And as it reasoned out, that's because it is both effective and safe."[100]

Additionally, Respondent submitted a YouTube video published on May 11, 2012, concerning Petitioner's SILVERFISH BULLY product titled "MyCleaningProducts introduces the Silverfish Bully" and a description of the video which reads as follows: "There are various kinds of pests that can invade a house. Among those pests is the silverfish. To help control the infestation of such small and destructive insect, MyCleaningProducts.com **introduced a new non-toxic cleaning solution**. And as it joins the Mother's Day celebration, the company is also giving out [a] 17% discount."[101]

---

[99] *Id*. at Exh. PR004, 26 TTABVUE 110-13.

[100] *Id*. at Exh. PR002, 26 TTABVUE 102-05.

[101] *Id*. at Exh. WEB002, 26 TTABVUE 135-36.

Respondent also points to a screenshot of Petitioner's website, www.bedbugbully, where it states that "Bed Bug Bully is formulated in multiple sizes for different needs. Large pest professionals, medical facilities, and resorts have been using our non pesticide bed bug spray since 2010. Now after renewing our license agreements with these companies we can offer it to both our past clients and to the public."[102]

Finally, Respondent argues that despite Petitioner's claims that it has been using the BULLY brand mark on pesticides since 2005, Petitioner's websites, mold-removal.biz and propertyperfections.net, maintained by Petitioner during these early years fail to even mention the BULLY-branded pesticides being offered by Petitioner.[103]

In response, Petitioner submitted the rebuttal declaration testimony of Petitioner's owner, Mr. Skupeika, who testified, inter alia, as follows:

> Although the articles use language such as "launch" and "introduce" with respect to the Bully Products, such should not be implied to mean that the referenced products were being made available for the first time to the public at or around the time of the press releases.[104]

> To the contrary, over the years, the Bully Products were re-formulated, and my belief is that the releases were distributed shortly after a change in formulation. In other words, the press releases highlight the new release of the Bully Products following a change in formulation.[105]

---

[102] *Id.* at Exh. WEB001, 26 TTABVUE 132-34.

[103] Respondent's Brief p. 21, 36 TTABVUE 22; Respondent's notice of reliance at Exhs. EX IA001-EXIA018, 26 TTABVUE 13-60.

[104] Skupeika Rebuttal Testimony Decl. at ¶ 5, 30 TTABVUE 5.

[105] *Id.* at ¶ 6, 30 TTABVUE 5.

With regard to the Bed Bug Bully June 29, 2009, press release identified above, Mr. Skupeika testified that this press release "indicates that Beg Bug Bully was being *re-released* as 'a new solution' designed 'to infuse a natural aroma-like therapy in the product to infuse wellness, energy and relaxation in one's home after using Bed Bug Bully.' I do recall adding natural aromas to the formulation around 2009 due to customer feedback indicating that the cinnamon aroma was a bit too strong."[106]

As to the YouTube video concerning Petitioner's SILVERFISH BULLY product, Mr. Skupeika testified that the video "was merely a marketing strategy to attract consumers to a 'new' product (the definition of 'new' is used broadly in marketing…), which I believe may have been re-formulated again shortly before that time."[107]

Concerning Petitioner's websites mold-removal.biz and propertyperfections.net maintained by Petitioner during its early years that fail to mention the BULLY-branded pesticides being offered by Petitioner, Petitioner contends that the absence of a mention of the Bully Products is of no consequence and merely constitutes a "red-herring" since these website screenshots were dedicated to advertising Petitioner's mold removal products.[108]

---

[106] *Id.* at ¶ 7, 30 TTABVUE 5.

[107] *Id.* at ¶ 14, 30 TTABVUE 6.

[108] *Id.* at ¶ 10, 30 TTABVUE 6.

Finally, regarding the screenshot of Petitioner's website, www.bedbugbully, Mr. Skupeika testified that this portion of its website "states only that Bed Bug Bully was first used by 'large pest professionals, medical facilities, and resorts' since 2010. It does not state that Beg [sic] Bug Bully was first available to consumers in 2010."[109]

We do not find Mr. Skupeika's rebuttal testimony convincing. When relevant consumers view the press releases and YouTube video regarding Petitioner's BULLY-branded pesticides, the use of the terms "new," "launch," or "introduce" would clearly be understood to mean that the discussed products are being available for the first time and not that the particular product is reformulated or being re-introduced under a new and improved formula. Indeed, the terms "reformulated" or "reintroduce" appear nowhere in the press releases or the description of the YouTube video. Moreover, Petitioner has not submitted any documentary evidence to corroborate the testimony that the products subject to the press releases and YouTube video were reformulated or based on improved formulas.

As to the YouTube video concerning Petitioner's SILVERFISH BULLY product, although Mr. Skupeika testified that the term "new" is broadly used in marketing to encompass re-formulated or improved products, his testimony did not include any indication that he is an expert in marketing and advertising terminology or techniques to substantiate his claim. Moreover, Petitioner did

---

[109] *Id.* at ¶ 13, 30 TTABVUE 6.

not submit any evidence to support his testimony regarding the expansive use of the term "new" in the marketing arena. Accordingly, we give little, if any, weight to Mr. Skupeika's testimony that the definition of the word "new" is used broadly in marketing materials.

Further, Petitioner's contention that the June 29, 2009, press release identified above states that the BED BUG BULLY pesticide product was being "re-released" is unavailing. Nowhere in the June 29, 2009, press release is there any indication that the product is being re-introduced or re-released. In fact, the press release specifically states that the BED BUG BULLY pesticide is a "new solution" not a reformulated one and that "Bed Bug Bully (bedbugbully.com) is being offered with a 100% guarantee and also a free sample during the **new product launch**." (emphasis added).

Finally, with respect to the screenshot of Petitioner's website, bedbugbully.com, we find Petitioner's testimony unpersuasive. As noted above, the wording in the screenshot states as follows:

> Bed Bug Bully is formulated in multiple sizes for different needs. Large pest professionals, medical facilities, and resorts have been using our non pesticide bed bug spray since 2010. Now after renewing our license agreements with these companies we can offer it to both our past clients and to the public.

A reasonable reading of the foregoing paragraph indicates that the Bed Bug Bully product was available to certain professional businesses only since 2010 and because the license agreements with these professional entities have been renewed, Petitioner can now also offer the product to these past clients and to

the general public at large. While Petitioner is correct that the advertisement does not specifically state that the Bed Bug Bully was first made available in 2010, when viewing the advertisement in its entirety, we believe that the average reader would understand the advertisement to mean that the product was first available to professional entities since only 2010 and now is available to the general public.

After careful consideration of the press releases, YouTube video and screenshot of Petitioner's bedbugbully.com website submitted by Respondent, we find that this evidence casts doubt as to the veracity of the other testimony and evidence of record that allegedly supports Petitioner's claim that it commenced use of its BULLY marks since 2005/2006. Ultimately, this evidence demonstrates that the other evidence purportedly demonstrating Petitioner's trademark use since 2005/2006 is untruthful or fabricated. [110]

## C. Invocation of Board's Inherent Authority to Sanction.

Accusations that Petitioner fabricated evidence or submitted untruthful testimony is a serious charge. After a careful review of the parties' arguments and the totality of the evidence of record, we find Respondent has established by clear and convincing evidence that Petitioner participated in a pattern of submitting testimony and evidence which is inaccurate, fabricated, altered, and

---

[110] We agree with Petitioner that because the screenshots from its websites mold-removal.biz and propertyperfections.net submitted by Respondent do not mention its BULLY pesticides does not necessarily mean that Petitioner's BULLY pesticides were not available since those specific screenshots are dedicated to the advertisement of Petitioner's mold removal products.

untruthful in order to demonstrate priority of use, an integral element of its claim of likelihood of confusion.

These types of actions engaged in by a party are not only prohibited, but tarnish and undermine the integrity of the Board and its proceedings. Petitioner's fabrication of evidence and untruthful testimony has tainted its entire case and has called into serious question the reliability of any remaining evidence or testimony submitted by Petitioner not subject to Respondent's construed motion for sanctions based on allegations of fabrication of evidence or litigation misconduct. Indeed, the application of the legal maxim "falsus in uno, falsus in omnibus" (false in one thing, false in everything) appears appropriate under these circumstances. We recognize that this legal maxim merely permits, but does not require, a fact finder to disregard the entirety of the testimony or documentary evidence submitted for trial. *See, e.g.*, *Van Buren v. Cargill, Inc.*, 2016 WL 231399, at *7 & n.5 (W.D.N.Y. Jan. 19, 2016). Nevertheless, we find that the application of the doctrine under the particular circumstances in this case, where it appears to us beyond question that Petitioner has perpetrated fraud upon the Board, justifies its application. *Siewe v. Gonzales*, 480 F.3d 160, 170 (2d Cir. 2007) (holding that "a finding of fraudulent evidence redounds upon all evidence the probative force of which relies in any part on the credibility of the petitioner"); *Lamber v. Blackwell*, 387 F.3d 210, 256 (3rd Cir. 2004) (describing the falsus in uno, falsus in omnibus principle, which permits a jury to disregard part or all of a witness's testimony

if the witness has testified falsely about a material fact); *United States v. Martinez*, 356 F. Supp. 2d 856, 870 (M.D. Tenn. 2005) (applying the doctrine falsus in uno, falsus in omnibus to discredit an agent's entire testimony due to certain inconsistencies with the record).

As the court stated in *Sarco Creek Ranch v. Greeson*, 167 F. Supp. 3d 835, 853 (S.D. Tex. 2016):

> The civil justice system serves a vital function in our society. While far from perfect, it is the best method humankind has ever devised for determining the truth. When the system is abused as it was by [plaintiff] in this case, the risk is not just that the truth will be distorted in a single case—itself a dire result. The even graver consequence is reduced public confidence in the ability of the justice system to deliver true and fair judgments. As a result, the sanctions for such conduct must be severe.

Petitioner's pattern of litigation misconduct in this proceeding constitutes fraud on the Board and is deserving of such a severe sanction. Although there is other evidence of record that is not subject to Respondent's construed motion for sanctions, the credibility and authenticity of such evidence has been severely tainted and, therefore, we do not consider it. In view of Petitioner's fraud on the Board, we invoke our inherent authority to sanction Petitioner and grant Respondent's construed motion for sanctions based on fabrication of evidence by dismissing the petition to cancel in its entirety.[111] *See e.g.*, *Vargas*

---

[111] Although we are dismissing the petition pursuant to our inherent authority to sanction based on Petitioner's litigation misconduct in this proceeding, it is clear that Petitioner has failed to prove its asserted claim of likelihood of confusion inasmuch as we are not considering any evidence submitted by Petitioner during its trial period for the reasons explained above.

*v. Peltz*, 901 F. Supp. 1572, 1574–79 (S.D. Fla. 1995) (dismissal appropriate due to persistent pattern of misconduct that included fraud on the court, fabrication of evidence, perjury, and obstruction of the discovery process); *see also In re Bailey*, 182 F.3d 860, 864-65 (Fed. Cir. 1999) (non-Article III tribunals have inherent authority to control proceedings and enter sanctions); *NSM Res. Corp. v. Microsoft Corp.*, 113 USPQ2d 1029, 1038 (TTAB 2014) ("The Board has discretion to tailor sanctions appropriate to the violations and may consider **any** measure designed to serve this purpose.") (emphasis added); *Carrini Inc. v. Carla Carini S.R.L*, 57 USPQ2d 1067, 1071 (TTAB 2000) ("Although the Board is not a court, the Board possesses the inherent authority to control the disposition of cases on its docket, which necessarily includes the inherent power to enter sanctions.").

**Decision:** The petition to cancel is dismissed with prejudice.